[No. 46711-5-I.   Division One.   August 18, 2003.]

THE STATE OF WASHINGTON, *Respondent*, v. MATTHEW FRANZINO BOLAR, *Appellant*.

---

492

*Gregory C. Link* (of *Washington Appellate Project*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Lee D. Yates, Deputy*, for respondent.

KENNEDY, J. — Matthew F. Bolar was charged with and tried for murder in the first degree (premeditated intent) and in the alternative with first degree felony murder based on the predicate crime of first degree burglary. He was convicted only of first degree felony murder, however, which he now appeals, arguing inter alia that the State's use of a faulty accomplice liability jury instruction necessitates a new trial and that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. But by finding Bolar guilty of felony murder, the jury necessarily found, in accord with the overwhelming evidence, that he

was a participant in the predicate felony of burglary in the first degree. Although Bolar has abandoned the position on appeal, at trial he contended, and correctly so insofar as his own conduct was concerned, that an accomplice liability instruction was unnecessary because the evidence was so clear that he acted as a principal. Accordingly, the erroneous accomplice instruction was harmless beyond a reasonable doubt.

Although a claim of self-defense is not available to one who commits first degree felony murder based on the predicate felony of burglary in the first degree, this case was tried to the jury as if the defense were available, and the State disproved self-defense beyond a reasonable doubt.

We reject Bolar's contention that the trial court erred in denying his intermittent requests to represent himself. In the unpublished portion of this opinion, we also reject his claims that his CrR 3.3 right to a speedy trial was violated, that the trial court made various evidentiary errors, and that he was deprived of a fair trial by reason of ineffective assistance of counsel and prosecutorial misconduct. Accordingly, we affirm Bolar's conviction for felony murder in the first degree.

## FACTS

Matthew Bolar lived with Kristine Zemek for about six months. Kristine was a crack addict, and she and Bolar often drove around and sold drugs together. After Bolar was arrested and placed in jail for four months for probation violations, Kristine began a relationship with Rodney Hill, who she met while dating Bolar. In need of money to buy drugs, she and Hill broke into Bolar's storage locker and stole some items that they then sold. Despite these thefts, Kristine resumed living with Bolar after he was released from jail.

One night shortly before the murder of Hill, Kristine, Bolar, Hill, Kristine's sister Marie, and Marie's husband got together to socialize at Kristine's stepfather's house. After

Hill left for the night, Kristine and Bolar got into an argument about Kristine's relationship with Hill. At one point during the argument, Bolar hit Kristine over the head with his gun. When Marie attempted to intervene, Bolar threatened her with the gun. Soon after that, Kristine left Bolar and began living with Hill. When she left, she took $800 and drugs that belonged to Bolar, as well as his car. Kristine later had Hill return Bolar's car.

For most of the next week, Kristine and Hill hid from Bolar by staying at various motels. Bolar kept finding them, however, and Kristine would have to call the police in order to be escorted away safely. Bolar contacted a number of people in his efforts to locate Kristine and Hill. He asked Dorsha Riggs to give a message to Kristine that he was going to break her neck and kill Hill. Riggs had previously heard Hill and Bolar make similar threats toward each other, behind each other's backs. Bolar also went to the residence of Suzanne Dennard, looking for Kristine and Hill, and offered her money and drugs in exchange for helping him find them.

About three days before the murder, Bolar went looking for Kristine and Hill at a motel where Robert Jones, a close friend of Hill's, was staying. Kristine and Hill were also staying in the motel, in a different room, but happened to be in Jones' room visiting when Bolar showed up. Hill and Kristine quickly hid in the bathroom, and Hill crawled out the bathroom window. Bolar told Jones that Kristine had stolen some cocaine from him and that he wanted it back. Bolar returned to Jones' motel room about 20 times, at all hours of the day and night and with different people, in further attempts to locate Kristine and Hill. On each of these occasions, Bolar offered Jones cocaine as a reward for information as to their whereabouts.

On March 8, 1999, two days before the shooting, Hill and Kristine called the police and expressed their fear of Bolar. Taped statements were made at that time. Kristine also obtained a restraining order against Bolar, which was dated March 9, 1999.

On March 10, 1999, at about 8 P.M., Suzanne Dennard saw Bolar again, this time at a mutual friend's house. Bolar was there with a very large guy named Luke Kristoff, the co-defendant at Bolar's subsequent trial. Bolar said that he was going to find Kristine and Hill and that he had a good idea where they were.

That night, Kristine and Hill were staying at the residence of John Cahill in Federal Way, where they believed that Bolar would not be able to find them. Cahill and his girl friend, Bonita Wells, were also there. The four were socializing and getting high on cocaine. Sometime before 9 P.M., Kristine and Hill went to sleep in a bedroom of Cahill's home.

At around 9 P.M., Cahill and Bonita prepared to leave to take Bonita home. After locking the front door, they started toward Cahill's truck. Just before they got to the truck, a car pulled in and Kristoff got out. Kristoff said that he was there to see Hill. Cahill replied that Hill was not there. Bolar then emerged from the car and joined Kristoff. Kristoff and Bolar said that they were not leaving until they saw Hill. Kristoff said that they could do it the easy way, or wait for Hill to come out of the "burning window." Bolar stated that he was a "gangster," and in a "Godfather-like" gesture, kissed Cahill on the neck. Cahill continued trying to convince Bolar and Kristoff that Hill and Kristine were not there, but after it became apparent that the two men were not going to take no for an answer, Cahill told Bolar he could come in if he stayed in the kitchen, and that he would get Hill so that they could talk. Cahill then unlocked the back door and he, Bolar, and Bonita walked into the kitchen.

After telling Bolar to stay by a chair in the kitchen, Cahill walked to the bedroom where Hill and Kristine were sleeping. As Cahill approached the bedroom door, Bolar pulled out a gun, pushed past Cahill, and crashed through the bedroom door with the gun drawn. Cahill briefly but unsuccessfully tried to control Bolar's arm. Kristoff then appeared in the bedroom and, after exchanging punches

with Hill, knocked Hill down as he tried to get up from the bed. While Kristoff held Hill down and Kristine watched in horror, Bolar pointed the gun close to Hill's back and shot him, without any exchange of words.

Cahill, who by then was fleeing the house, heard the shot. Outside, he found a distraught Bonita standing near his truck. Kristoff came running out of the house, looked at Cahill and yelled, "Go!" Bolar came out of the house and got into the passenger seat of the vehicle in which he and Kristoff had arrived. Kristoff took the driver's seat and the two sped off. Kristine called 911.

Cahill and Bonita also drove from the scene, but soon returned. Cahill found Kristine crying and screaming hysterically. When he entered the house, he found Hill on the bedroom floor with a bullet hole in his back. He tried to take Hill's pulse but was not sure he could feel it. Kristine told him that Bolar had shot Hill in the back, and that he had pointed the gun at her and pulled the trigger, but the weapon did not fire.

The police soon arrived. After Kristine told officers Douglas Laird and Thomas Robinson that her boyfriend had been shot in the bedroom by her ex-boyfriend, Officer Laird entered the house and found Hill lying on the floor with a small bullet hole in the middle of his back. Officer Laird found no weapons, bullets, or casings in the immediate area of the body.

Dr. Dan Straathof, a King County medical examiner, examined Hill at the scene of the crime and later performed the autopsy. He noted scrapes and bruises on the backs of Hill's hands, as well as contusions on his upper chest and arm, which were consistent with having thrown and received punches. He noted that the bullet wound was surrounded by soot and powder stippling, which is indicative of a fairly close-range shot. Further examination unearthed a bullet which had entered the middle of Hill's back, passed through his spinal cord, damaged the two major blood vessels in his abdomen, passed through several loops of

bowel, and then lodged under the skin of his abdomen. Hill likely suffered immediate paralysis and a quick death.

The day after the murder, a passerby found a .357 revolver at the corner of Steel Lake Park and 312th, in Federal Way. The passerby wrapped the gun in a towel, took it home, and called police. The gun had two hollow-point bullets and casings inside. One of the cartridges had been struck twice by the firing pin, indicating that it had been struck once, come around again and been struck again— consistent with Kristine's statement that Bolar had pointed the gun at her and pulled the trigger, but the weapon did not fire.

Firearms examiner Mathew Nodel compared the slug recovered during the autopsy with the recovered .357 revolver and concluded that the slug that killed Hill had been fired from that weapon. Test firings comparing the soot and stippling pattern observed at the autopsy determined that Hill had been shot at a range less than eight inches. The State theorized at trial that Bolar tossed the gun from the car as he and Kristoff fled the scene of the crime.

Bolar spent a number of days after the murder with a friend, Wendy McElheran, eluding the police. Bolar began wearing a wig, a trench coat, and thick glasses to change his appearance. He called Suzanne Dennard and told her that he wanted to find Kristine, in that he did not want her to put him away for life.

Because of Bolar's interest in locating Kristine, the police sought to use a ruse to arrest him. On March 16, 1999, an officer pretending to be a friend of Kristine's spoke with Bolar by telephone and tried to set up a meeting. Bolar became angry and screamed, "I want my bitch!" The officer then put Kristine on the line and she and Bolar made arrangements to meet at a certain grocery store. Meanwhile, officers in the field had been listening over the police radio to the officer's conversation with Bolar, and with information gathered during the call were able to find Bolar riding as a passenger in a Honda driven by Wendy

McElheran. When the police activated their lights, Wendy accelerated and tried to lose the police. She failed to make a turn, and ran through a ditch and into a fence. Bolar was arrested as he ran from the crash. The wig he had been using as a disguise was recovered.

Detective Stephen Arbuthnot contacted Bolar at the hospital where Bolar had been taken for treatment of injuries he received in the car crash. Bolar, who appeared clear-minded with no problem talking, had an extensive conversation "off the record" with detective Arbuthnot. Subsequently, after full advisement of his rights, Bolar decided to go on the record and give a written statement. In his three-page statement, Bolar discussed the various wrongs that Hill and Kristine had perpetrated against him, including the theft of his money, the theft of his drugs, the theft of his car, and the theft of items from his storage locker. Bolar also said that he and Kristoff, who Hill had also angered, tracked down Hill and Kristine. At Cahill's residence, Hill tried to keep them out of the bedroom and fought with Kristoff. Bolar said that he then "just lost it" and shot Hill once. At no point during his three-page handwritten confession did Bolar claim that he had acted in self-defense.

## PROCEDURAL HISTORY

Bolar was charged by amended information with the first degree premeditated murder of Hill and in the alternative with felony murder of Hill while in the course of committing first degree burglary. He claimed at trial to have shot Hill in self-defense.

The "to convict" instruction for felony murder stated:

Alternatively, to convict the defendant of the crime of felony murder in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about March 10, 1999, Rodney Hill was killed;

(2) That the defendant or an accomplice was committing or attempting to commit Burglary in the first degree;

(3) That the defendant or an accomplice caused the death of Rodney Hill in the course of or in furtherance of such crime or in immediate flight from such crime;

(4) That Rodney Hill was not a participant in the crime; and

(5) That the acts occurred in the State of Washington.

Clerk's Papers at 174. A first degree burglary instruction followed, stating:

A person commits the crime of burglary in the first degree when he or an accomplice enters or remains unlawfully in a building with intent to commit a crime against a person or property therein, and if, in entering or while in the building or in immediate flight therefrom, that person or an accomplice in the crime is armed with a deadly weapon or assaults any person.

Clerk's Papers at 175.

On April 7, 2000, Bolar was found guilty of first degree felony murder, with a special verdict that he was armed with a firearm while committing the crime. The jury was unable to reach a unanimous verdict with respect to the premeditated murder charge. The court imposed a standard range sentence of 41 years and 8 months. Bolar brought this timely appeal.

## ANALYSIS

### I

■■ Washington's accomplice liability statute states, in relevant part:

(1) A person is guilty of *a* crime if it is committed by the conduct of another person for which he is legally accountable.

(2) A person is legally accountable for the conduct of another person when:

. . . .

(c) He is an accomplice of such other person in the commission of *the* crime.

(3) A person is an accomplice of another person in the commission of *a* crime if:

(a) With knowledge that it will promote or facilitate the commission of *the* crime, he

(i) solicits, commands, encourages, or requests such other person to commit *it*; or

(ii) aids or agrees to aid such other person in planning or committing *it* . . . .

RCW 9A.08.020 (emphasis added). The court's accomplice liability instruction stated in relevant part:

A person is an accomplice in the commission of *a* crime if, with knowledge that it will promote or facilitate the commission of *a* crime, he or she either:

(1) solicits, commands, encourages, or requests another person to commit *the* crime; or

(2) aids or agrees to aid another person in planning or committing *the* crime.

Clerk's Papers at 176 (emphasis added). Although similar, this instruction is not identical to either of the accomplice liability instructions that were found to be erroneous in *State v. Roberts*, 142 Wn.2d 471, 510, 14 P.3d 713 (2000) and *State v. Cronin*, 142 Wn.2d 568, 576-77, 14 P.3d 752 (2000). But to fully mirror the statute, the second "a crime" found in the first sentence should have said "the crime," and so the instruction is erroneous. *See Roberts*, 142 Wn.2d at 509-10 (noting that the use of the phrase "a crime" in the first paragraph of the instruction given in that case, rather than "the crime" as exists in the parallel portion of the statute, RCW 9A.08.020(2)(c), could permit the jury to convict a defendant of the charged crime based on his knowing facilitation of some other crime). Accordingly, we will consider whether the error is harmless beyond a reasonable doubt. *See State v. Brown*, 147 Wn.2d 330, 340, 58 P.3d 889 (2002) (even in cases where multiple crimes are charged against multiple defendants as to some of the charges, the use of an erroneous accomplice liability instruction can be harmless).

It will be remembered that the defendants in *Roberts* and *Cronin* were each convicted both of aggravated first degree murder and first degree felony murder after one Eli Cantu was murdered in the course of a kidnapping and robbery that were committed by the two defendants (who were tried separately). The erroneous accomplice liability instructions given in those two cases were determined not to be harmless with respect to the aggravated murder convictions, but in both cases the Supreme Court affirmed the defendants' felony murder convictions. In *Cronin* the court said: "Finally, we conclude that because Cronin's first degree felony murder conviction was unaffected by the instructional error, a point Cronin concedes, his felony murder conviction should be affirmed." 142 Wn.2d at 586. In *Roberts*, the court affirmed the felony murder conviction without expressly ruling that the erroneous accomplice liability instruction did not affect the felony murder conviction, but noted:

> Thus, the State is technically correct in its statement that "you would not be able to obtain accomplice liability to certain murders because certain murders happen too quickly for a person to actually know a murder is going on [for] an accomplice to know a murder is going to happen." This is relatively insignificant, however, because such defendants may still be charged with *felony murder* in the first degree based solely on the mens rea for the predicate offense. RCW 9A.32.030(1)(c); *State v. Osborne*, 102 Wn.2d 87, 93, 684 P.2d 683 (1984).

*Roberts*, 142 Wn.2d at 511 n.14 (citation omitted).

The mens rea for accomplice liability is knowledge, and the legislature intended that the culpability of an accomplice not extend beyond the crimes of which the accomplice actually has knowledge. *Id.* at 511. But the mens rea for felony murder is based solely on the mens rea for the predicate offense—here, burglary in the first degree:

> A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight there-

from, *the actor or another participant* in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

RCW 9A.52.020 (emphasis added). Thus, intent to commit a crime against a person or property in the unlawfully entered building is the mens rea required of a burglar. "A person acts with intent or intentionally when he acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). "When acting knowingly suffices to establish an element, such element also is established if a person acts intentionally." RCW 9A.08.010(2).

RCW 9A.32.030(1)(c) provides that a person is guilty of murder in the first degree when he or she commits or attempts to commit the crime of burglary in the first degree (among other listed felonies) "and in the course of or in furtherance of such crime or in immediate flight therefrom, *he or she, or another participant*, causes the death of a person other than one of the participants . . . ." (Emphasis added.)[1] By finding Bolar guilty of felony murder in the first degree, the jury necessarily found that he was a participant in the first degree burglary that resulted in the death of Hill, that is that he entered the building where Hill was found with the intent to commit a crime against persons or property therein—and thereby knowingly facilitated the crime of burglary, as a matter of law.

Indeed, when it comes to felony murder standing alone (in the absence of an alternative charge of, for example, premeditated murder as in this case) and where the undisputed evidence shows that all of the participants acted as principals in committing the predicate felony, an accomplice liability instruction is superfluous, for the felony murder statute itself expressly establishes the complicity of both the killer and the nonkiller participant in the homicide as principals. *See State v. Rice*, 102 Wn.2d 120, 125, 683 P.2d

---

[1] The word "participant" is not defined in Title 9A RCW. Its common meaning, in the noun form, is a person who participates in something. 2 THE NEW SHORTER OXFORD ENGLISH DICTIONARY 2109 (Oxford Univ. Press 1993). The Latin term *particeps criminis* means "a partner in crime or accomplice." *Id.*

199 (1984) (accomplice liability instruction—the same instruction as given in this case—was not necessary where both defendants charged with felony murder as principals).

The felony murder doctrine originated in English common law as early as 1536. *State v. Harris*, 69 Wn.2d 928, 931, 421 P.2d 662 (1966). Washington's felony murder statute, like those of other states, does not set forth a requisite mental state; instead, the state of mind required for the murder is the same as that which is required to prove the predicate felony. *State v. Dennison*, 115 Wn.2d 609, 615, 801 P.2d 193 (1990). Thus, if a death occurs in the attempt, commission of, or immediate flight from a first degree burglary, it is unnecessary to prove that the killer or another participant acted with malice, design, or premeditation. *Id.* Even if the murder is committed more or less accidentally in the course of the commission of the predicate felony, the participants in the felony are still liable for the homicide. *See State v. Leech*, 114 Wn.2d 700, 708, 790 P.2d 160 (1990) (the purpose of the felony murder rule is to deter felons from killing negligently or accidentally by holding them strictly responsible for any deaths they cause). In this area of the law, one really is "in for a dime" (the predicate felony being the dime), "in for a dollar" (the resulting homicide being the dollar), for felony murder is a strict liability crime subject to a statutory affirmative defense which Bolar did not interpose in this case.[2] *See Dennison*, 115 Wn.2d at 616 ("Because Washington's felony murder statute clearly holds felons strictly responsible for any deaths occurring under the conditions specified by the

---

[2] It is a statutory defense to felony murder if the defendant:

(i) Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and

(ii) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and

(iii) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and

(iv) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

RCW 9A.32.030(1)(c).

statute, the issue is whether Dennison's actions fall within the statute.").

Moreover, "[t]he felony murder statute expressly establishes the nonkiller participant's complicity in the homicide as a principal." *Rice*, 102 Wn.2d at 125. Accordingly, Bolar was inherently charged and convicted as a principal, the accomplice liability instruction was irrelevant to the felony murder charge, and any error in that instruction was per se harmless. Indeed, a felony murder conviction cannot rest on any other crime than the predicate felony—here, first degree burglary. Contrary to Bolar's contention, it does not matter for purposes of felony murder whether he intended only to assault Hill when he unlawfully entered or remained in Cahill's home—or for that matter whether he intended only to commit a crime against property. "The" crime for purposes of felony murder is the burglary, not the crime against persons or property that Bolar or another participant may have intended to commit at the time of the unlawful entering or remaining.

This is no doubt why our Supreme Court recognized in both *Roberts* and *Cronin* that while the erroneous accomplice liability instructions in those cases required reversal of the defendants' convictions for aggravated first degree murder, reversal of their felony murder convictions was not required.

The evidence was overwhelming that Bolar was a principal in the predicate felony of first degree burglary. Bolar and Kristoff intimidated Cahill until Cahill thought he had to let them inside or his house would be burned down. Cahill then expressly limited Bolar's presence to the kitchen, but before Cahill could get Hill to come out and talk to Bolar, Bolar charged through the closed bedroom door behind which Hill was sleeping.[3] Kristoff then came into the room and began assaulting Hill and, while Kristoff

---

[3] Even if Bolar's initial entry could be deemed invited, he exceeded the scope of the invitation by entering the bedroom without permission or authority. Thus there was an unlawful entry or remaining sufficient to support a burglary charge. *See State v. Collins*, 110 Wn.2d 253, 751 P.2d 837 (1988); *State v. Allen*, 90 Wn. App. 957, 955 P.2d 403 (1998).

held Hill down, Bolar shot Hill in the back, killing him. Bolar confessed to police that he was the shooter. There is no doubt whatsoever that Bolar was a full participant in the burglary, and that in fact he was the killer participant. In light of this evidence and the statutory scheme, there is no practical or identifiable consequence from the deficiency in the court's accomplice instruction, and the instructional error was harmless beyond a reasonable doubt.

## II

Bolar next contends that the State failed to disprove self-defense beyond a reasonable doubt. Bolar's theory at trial was that he needed to kill Hill before Hill killed him—therefore, he sought Hill out, found him after a week of intensive searching, and shot him dead. By Bolar's theory of the case, the predicate burglary, as well as the killing, was done in self-defense. In a different context—one in which the defendant shot and killed an armed neighbor who came to investigate a residential burglary-in-progress and then claimed that the shooting was in self-defense—our Supreme Court held in *Dennison*, 115 Wn.2d at 616, that a claim of self-defense was not available to the defendant. This was because the defendant's conduct fell squarely within the first degree felony murder statute. The court said: "Since the statutory exceptions to felony murder do not apply, Dennison must be held strictly responsible for the death caused while fleeing from the first degree burglary. The proposed self-defense instruction was properly refused." *Id.* As noted by the dissent in *Dennison*, 115 Wn.2d at 629 (Utter, J., dissenting), this was tantamount to a ruling that "the statutory defenses specifically enumerated in the felony murder statute are exclusive." *See* RCW 9A.32.030(1)(c) (listing the statutory defenses to felony murder—self-defense is not on the list).

In the Court of Appeals' version of *Dennison*, the court squarely held that self-defense is not available to a person who is charged with felony murder in the first degree based

on the predicate felony of burglary in the first degree, as a matter of law. *See State v. Dennison*, 54 Wn. App. 577, 581-82, 774 P.2d 1237 (1989), *aff'd*, 115 Wn.2d 609, 614-16, 801 P.2d 193 (1990) (holding that the trial court did not err in refusing to give a self-defense instruction where the defendant was charged with first degree felony murder based on the predicate felony of first degree burglary, in that the defense was unavailable as a matter of law). The intermediate appellate court reasoned that " '[t]he purpose of the felony-murder rule is to deter even accidental killings in the commission of designated felonies by holding the felon strictly liable for murder.' " *Dennison*, 54 Wn. App. at 581 (quoting *People v. Loustaunau*, 181 Cal. App. 3d 163, 226 Cal. Rptr. 216, 219 (1986)).

If a claim of self-defense is unavailable as a matter of law to a burglar who kills, even accidentally, in the course of committing a "traditional" burglary, can the defense possibly be available to one whose unlawful entry or remaining was done for the admitted purpose of killing an occupant of the building? We think not. In *State v. Janes*, 121 Wn.2d 220, 240, 850 P.2d 495 (1993) (quoting *People v. Dillon*, 24 Ill. 2d 122, 125, 180 N.E.2d 503 (1962)) our Supreme Court said: " '[T]he right of self-defense does not imply the right of attack in the first instance or permit action done in retaliation or revenge.' " By his own theory of self-defense, Bolar went searching for Hill, located him, and attacked in the first instance. Moreover, the evidence is very strong that he acted in retaliation and revenge for the theft of his property and the loss of his girl friend to a rival.[4]

The state of mind of the defendant at the time of the killing is not an element of the crime of felony murder. As was stated by our Supreme Court in *State v. Craig*, 82 Wn.2d 777, 781-82, 514 P.2d 151 (1973)—a case in which the appellant and a co-defendant beat and stabbed a

---

[4] We are not called upon to decide whether Bolar was entitled to claim self-defense with respect to the premeditated murder charge—a matter we think is in considerable doubt, given the fact that Bolar went searching for Hill and struck in the first instance.

taxicab driver to death in the course of committing a robbery, after which the appellant was charged with felony murder and sought a self-defense instruction which the trial court properly refused:

> Nowhere in the statute is the state of mind of the defendant at the time of the killing made an element of the offense [of felony murder]. . . .
>
> . . . .
>
> . . . The burden was on the state to show the killing by the defendant and that it was done in connection with the robbery, as part of the same transaction. It was not incumbent upon it to prove the state of mind of the defendant at the time of the killing. . . . The state could prove that there was a robbery and a murder. It could not prove what the defendants were thinking when they committed the murder, except by inference from the circumstances. Having killed and robbed the victim, the appellant cannot now be heard to say that his intentions were pure when he administered the blows which resulted in the death of the victim.

*Craig*, 82 Wn.2d 777 at 781-82.[5]

The State bears the unalterable burden of proving every element of the crime charged beyond a reasonable doubt. *State v. Camara*, 113 Wn.2d 631, 640, 781 P.2d 483 (1989) (citing *Martin v. Ohio*, 480 U.S. 228, 233-34, 107 S. Ct. 1098, 94 L. Ed. 2d 267 (1987)). In *Camara*, the court held that although consent remains a defense to a charge of rape by forcible compulsion, nonconsent is no longer an element of the crime. Accordingly, the State did not have the burden of proving nonconsent. 113 Wn.2d at 638-40. Because the felony-murderer's state of mind at the time of the killing is not an element of felony murder, we do not believe that the State bore the burden of disproving self-defense with re-

---

[5] In *Craig*, the Supreme Court stated that it did not need to decide whether self-defense could ever be available to a person charged with felony murder. The defense was not available to the defendant Craig because he was the aggressor, and he had not withdrawn from the robbery, or abandoned his threatening behavior, so that if the taxicab driver struck at the appellant with a lug wrench in the hope of preventing the robbery, the driver was entitled to do that, and self-defense was not available to the appellant. *Craig*, 82 Wn.2d at 783-84.

spect to the felony murder charge—indeed, we do not believe that the defense was even legally available with respect to that charge.

But this case was tried to the jury as if self-defense were a defense to the felony murder charge, and the State has not cross-appealed claiming that the trial court erred by allowing the jury to consider self-defense with respect to that charge. Accordingly, we will consider whether the State—assuming for purposes of this part of our analysis that it bore the burden of disproving self-defense—met the burden. Evidence is sufficient to support a conviction if, when viewed in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

The evidence was overwhelming that Bolar shot and killed Hill in the course of committing a first degree burglary. Although Bolar claimed that he was in fear for his life, it was Hill and Kristine who telephoned police in fear of *their* lives—not the other way around. It was Hill who crawled out the motel room bathroom window in order to avoid confronting Bolar, not the other way around. Bolar failed to mention to police in the course of his confession that he had shot Hill in self-defense. The State presented ample evidence that Bolar shot and killed Hill, and tried to shoot Kristine as well, out of jealousy, and out of revenge for the theft of his property, rather than out of fear for his own life. Bolar even explained to his mental health expert who testified at the trial in support of the self-defense claim that people cannot steal from other people and expect to get away with it. Bolar fled the scene of the murder, discarded the murder weapon, and eluded police for a considerable period of time by wearing a disguise and by remaining out of sight—any rational juror could reasonably conclude that these were not the acts of a person who truly believed that he had killed in self-defense.

In sum, Bolar was not prejudiced by the erroneous accomplice liability instruction, and the State met any

burden it may have had to disprove self-defense in connection with the felony murder charge.

## Additional Procedural History

On March 12, 1999, Bolar was charged by amended information with premeditated murder and, in the alternative, with first degree felony murder. He was arraigned on March 23, 1999. Trial was set for May 17, 1999, within the 60-day requirement of CrR 3.3. Counsel was appointed to represent Bolar.

On April 7, 1999, over a month before trial was scheduled to begin, Presiding Judge Michael S. Spearman granted Bolar's motion to proceed pro se and also appointed attorney Michael Danko to discuss with Bolar the pros and cons of proceeding pro se.

On April 13, 1999, Bolar appeared in court with Mr. Danko. After discussing the ramifications of Bolar's decision, whether his request was unequivocal, and his competency, Judge Spearman granted Bolar's request to proceed pro se, without standby counsel.

On May 4, 1999, however, Judge Charles W. Mertel, who was assigned to preside over the trial, appointed Danko to serve as standby counsel over Bolar's objection.

On May 7, 1999, Bolar asked that Danko be discharged as standby counsel, claiming that Danko had violated the confidentiality of Bolar's communications and that their interactions had been contentious. Bolar claimed he was not opposed to standby counsel, just to Danko. Judge Mertel ruled that Danko would remain as standby counsel, but explained to Bolar that he was not required to use Danko's services.

On May 13, 1999, Bolar accepted Danko as his standby counsel, stating that he and Danko were developing a working relationship, that he needed Danko's help, and that he respected Danko's abilities.

On May 17, 1999, the State moved to exclude witnesses. That motion was granted and CrR 3.5 and 3.6 hearings

were held. The State contends and we agree that, for speedy trial purposes, trial began on this date. *See State v. Carson*, 128 Wn.2d 805, 820, 912 P.2d 1016 (1996) (a defendant is brought to trial for speedy trial purposes when the case is called for trial and the trial court hears and disposes of preliminary motions).

On May 18, 1999, Bolar complained that Danko and the prosecutor were in collusion with one another. After conducting a hearing on the matter, the court found no evidence of violation of attorney-client confidences and thus refused to replace Danko as standby counsel. However, later that day after hearing various additional motions and argument, the court permitted Bolar to substitute attorney David Roberson as standby counsel, in Danko's place.

On May 19, 1999, various motions were heard.

On May 24, 1999, Bolar and the prosecutor were admonished not to violate discovery rules, and Bolar was warned that if further violations occurred the court would reconsider the ruling allowing him to proceed pro se.

On May 25, 1999, after the court ruled against him on a number of issues, Bolar indicated that he wished to give up his pro se status and have Roberson represent him. In response to this request, the trial court stated:

> Now, I want to be real clear with you on this. If you do this, Mr. Bolar, you're not going to sort of blow in and out, move in and out of representing yourself. If you make this decision, which I believe is in your best interests, and I've told you that all along, if you make this decision, then Mr. Roberson is going to be your counsel of record, and that's the way we're going to go through this, whether it's up at Division I or here. So if you want to take some time and think about this, that's fine. I believe it's in your best interests to have a trained solid counsel such as Mr. Roberson represents. But I just want to be real clear with you, once we make this decision and the shift, we're not going to sort of move in and out of it, so I'm real clear with you on that.

Report of Proceedings (May 25, 1999) at 42-43. While Bolar complained that he felt he was forced to make the decision, because of the various pretrial decisions that the court had

made that he felt were unfair, he continued in his relinquishment of his pro se rights.

Roberson then sought additional time to prepare to defend the case. Roberson also stated that the case could be considered in trial but in recess, without need of a speedy trial waiver, or the court could ask Bolar to sign a speedy trial waiver.

On May 26, 1999, Bolar sought to remove the judge from the case after he accused the court of improperly ruling in the State's favor. The motion was denied. The court also asked Bolar if he still wished to give up his pro se rights. Bolar agreed to have Roberson conduct the case, and the court continued the matter to August of 1999. Bolar waived his speedy trial rights to accommodate this continuance.

On June 4, July 9, and July 13, 1999, additional motions were made and ruled upon.

On July 28, 1999, Bolar moved to discharge Roberson and to proceed pro se, contending that Roberson had too full a work load, was not adequately prepared for trial, and thus was failing to vigilantly pursue his defense. The trial court denied Bolar's request, indicating that trial had begun in May and that Bolar's request was designed to delay and obstruct the orderly administration of justice. Bolar accused the judge of dishonesty in his rulings, and asked him to remove himself because of bias. The court, in continuing to discuss the reasons for denying Bolar's pro se motion, stated that Bolar either could not or would not follow the rules of the court and the rules of evidence, and simply objected to everything, regardless of merit.

On August 16, 1999, Roberson requested more time to prepare for the presentation of expert testimony by Dr. Olsen, as well as to secure other defense witnesses. Roberson also stated that if a continuance was denied, Bolar wished to proceed pro se because he knew the case better. The court denied Bolar's request to proceed pro se. Roberson then stated that Bolar agreed with the continuance request and would sign a waiver, although Roberson

agreed with the court that the matter was technically in recess and that there was no speedy trial issue. The court granted Roberson additional time to prepare, continuing the case until October 20. A speedy trial waiver was signed, as was an order of continuance.

On August 19, 1999, Kristine Zemek's deposition was taken. Bolar moved to represent himself pro se for purposes of cross-examining Kristine. This motion was denied.

On September 13, 1999, Bolar complained that Roberson was deliberately incompetent and ineffective. Bolar also complained about the conduct of the judge and prosecutor. The proceedings concluded with Bolar making another motion to remove Roberson and to proceed pro se. Roberson noted that Bolar had made threats against him. The motion was denied, but the court stated that if Roberson felt he needed assistance from a co-counsel, the court would consider providing such relief.

On September 17, 1999, Roberson reported to the court that Bolar had made it clear to him that he should ask questions Bolar's way or Bolar would assault him in open court. Roberson recommended that the court allow Bolar to proceed pro se, stating that while he was ready to go to trial, he did not want to represent Bolar due to Bolar's threats and his own unwillingness to be Bolar's puppet. The trial court denied the motion and, after Bolar became disruptive, threatened to have Bolar gagged and handcuffed if necessary to prevent disruption.

On September 21, 1999, Roberson moved to withdraw, stating that he refused to further represent Bolar because Bolar had threatened both him and his child. Another attorney, John Hicks, appeared and indicated that he could represent Bolar, but not on the date trial was scheduled to resume, October 20, and that trial would have be continued or recessed. The trial court did not allow Roberson to withdraw at that point, but continued the hearing one day so that attorney Anthony Savage could appear along with Hicks. The State indicated its belief that Bolar should be permitted to represent himself. The court denied reinstate-

ment of Bolar's pro se status, reiterating its belief that Bolar was not competent to represent himself and was unwilling to abide by the rules of the court or the rules of evidence.

On September 22, 1999, Roberson was relieved of his representation of Bolar and the court appointed Savage and Hicks as co-counsel. Findings of fact and conclusions of law were entered denying Bolar's motion to revert to pro se status and stating the various reasons therefore. The deputy prosecutor indicated that, in drafting the findings for the court, he omitted a finding that Bolar was incompetent because he believed the trial court was incorrect on that point. Trial was then adjourned to January 4, 2000, to accommodate co-defense counsel's calendars. Bolar refused to waive his speedy trial date.

On October 4, 1999, Presiding Judge Spearman declined to review Judge Mertel's decision regarding Bolar's pro se status. The State, in its memorandum in support of Bolar's request to proceed pro se, stated that it believed Bolar timely and unequivocally waived his right of counsel, that Bolar should be allowed to proceed pro se, and that it had grave concerns that the pro se and speedy trial issues might warrant a reversal on appeal.

On October 20, 1999, Hicks, Savage, and the prosecutor gave notice to the court that their schedules would not permit them to be in trial on January 4, 2000. After discussion, the court stated:

> I'll have to think about this. I think the way I'm going to do it right now is we're going to leave this on January 4th for the readjournment of this trial, and that is a key word I think in this case, and I'm going to discuss it with Judge Gain [about reconciling counsels' schedules]. This is not—we're not starting this trial January 4th. We've adjourned it, and we've been in adjournment for a number of months now to deal with a variety of problems.

Report of Proceedings (Oct. 20, 1999) at 11.

On January 6, 2000, the court and counsel agreed to resume the trial on February 22, 2000, in light of their

collective schedules. Bolar objected to any further continuances and requested that the case be dismissed for violation of his speedy trial right. The court continued the matter to February 23, 2000.

On January 19, 2000, argument and rulings occurred regarding Bolar's mental capacity defense.

On January 25, 2000, the State moved for a mental evaluation of Bolar by an independent expert, which the court granted. Bolar indicated that he would not submit to an examination, and commenced a lengthy tirade about the conduct of the prosecutor, the court, and his own lawyers.

On February 25 and March 3, 2000, the court and counsel discussed their respective schedules and set Bolar's trial to resume on March 13. A deposition was also taken from defense witness Trina Baldwin on March 3.

On March 13 and 14, 2000, Bolar's trial resumed, with Savage and Hicks representing him. Numerous motions were heard.

From March 15 to April 6, 2000, Bolar was tried before a jury. At one point during trial, Bolar's attorneys moved to withdraw because Bolar was upset over the questions they had been asking and because Bolar had threatened to stick a pencil in Hicks' eye and cause "lifelong" injuries to both attorneys. Rather than shackle Bolar, the court decided to place a plainclothes officer next to Bolar. Hicks and Savage continued to represent Bolar through the remainder of the trial.

## ANALYSIS

### Right to Self-Representation

Bolar argues that the trial court improperly denied his repeated, unequivocal requests to exercise his right to self-representation, and thus a new trial should be ordered. We uphold the trial court's rulings on this matter. Bolar's requests were initially timely, but he changed his mind and elected to be represented by counsel. Once trial was under-

way, though periodically in recess, Bolar's requests were not only untimely but also inconsistent, sometimes changing from one day to another. The court found that the inconsistent requests were themselves part of a concerted effort of purposeful disruption designed to obstruct the orderly administration of justice, particularly when viewed in combination with Bolar's threats to do injury to his attorney in open court in order to provoke a mistrial.

The state and federal constitutions guarantee a criminal defendant the right to self-representation. U.S. CONST., amends. VI, XIV; WASH. CONST., art. I, § 22. In order to exercise the right, however, a request must be unequivocal, knowingly and intelligently made, timely, and not for the purpose of delaying trial or obstructing justice. *State v. Breedlove*, 79 Wn. App. 101, 106, 900 P.2d 586 (1995). Before trial, the defendant's interest in self-representation is paramount, but as the trial draws closer and once it begins, the interest in the orderly administration of justice becomes weightier. *Id.* at 107. We review a trial court's denial of a request for self-representation for abuse of discretion. *Id.* at 106.

The presiding judge granted Bolar's initial request to proceed pro se, roughly one month before trial. An attorney was also appointed to advise Bolar on the pros and cons of that decision, and the trial court thoroughly discussed the issue with Bolar to ensure that the request was made unequivocally, knowingly, and intelligently. The trial court appointed standby counsel to help Bolar in the event that self-representation proved too difficult, and later even allowed Bolar to substitute in a different standby counsel after Bolar became dissatisfied with his original standby counsel. But then, Bolar decided that he wanted to be represented by counsel after all. By this point, trial had commenced, and the trial court had full discretion to grant or deny Bolar's request. *State v. DeWeese*, 117 Wn.2d 369, 376-77, 816 P.2d 1 (1991) (once an unequivocal waiver of counsel has been made, reappointment is wholly within the discretion of the trial court).

When Bolar elected to accept full representation by Roberson, the court explicitly told Bolar that this change was to be final. Two months later, though, Bolar again asked the court to change his representation status by discharging his counsel and allowing him to proceed pro se. Considering Bolar's repeated vacillation on this issue, his threats to do physical injury both to Roberson and the attorney's child resulting in Roberson's justifiable refusal to continue with the representation—and Bolar's own disruptive conduct in the courtroom, indeed, his outright abuse of the court and its processes—we affirm the trial court's denial of Bolar's repeated requests to proceed pro se. The trial court's express findings that Bolar purposely vacillated regarding self-representation in order to delay the trial, and indicated his clear intent to disrupt the orderly administration of justice by threatening to do physical harm to his attorney (Roberson) at a time when the attorney was ready to begin jury selection, are fully supported by the record and are, therefore, verities for this appeal. The right of self-representation does not include the right to disrupt the orderly administration of justice. *Breedlove*, 79 Wn. App. at 106.

We affirm Bolar's felony murder conviction.

A majority of the panel having determined that the remainder of this opinion lacks precedential value and will not be printed in the Washington Appellate Reports but will be filed for public record in accord with RCW 2.06.040, it is so ordered.

GROSSE and SCHINDLER, JJ., concur.

Reconsideration denied October 1, 2003.

Review denied at 151 Wn.2d 1027 (2004).