79 P.3d 1168 (2003)
119 Wash.App. 221
STATE of Washington, Respondent, Cross-Appellant,
v.
Kimberly Kristina CARTER, Appellant/Cross-Respondent.
No. 48509-1-I.
Court of Appeals of Washington, Division 1.
November 24, 2003.
*1169 David Bruce Koch, Catherine Lynn Floit, Seattle, for Appellant.
Constance Mary Crawley, Snohomish County Courthouse, Everett, for Respondent.

OPINION PUBLISHED IN PART
KENNEDY, J.
Kimberley Carter appeals her felony murder conviction, arguing, inter alia, that the use of a faulty accomplice liability jury instruction necessitates a new trial. While the instruction was erroneous, the error was harmless beyond a reasonable doubt, in that the charge was felony murder. Although Ms. Carter was not personally present during the commission of the predicate crimes of burglary and robbery in the first degrees, the State proved beyond a reasonable doubt that she knowingly solicited, commanded, encouraged, or requested two other persons to commit them, and they did so. Therefore, Ms. Carter was a participant in the predicate felonies, and is liable for the death of Scott Donaldson, who was shot and killed by one of her confederates in the course of committing the crimes. When it comes to felony murder, the erroneous accomplice liability instruction here at issue is per se harmless, beyond a reasonable doubt. Accordingly, we affirm the judgment and sentence.[1]

FACTS
The Shooting
Scott Donaldson owned a house in Everett, Washington, which he shared with four housemates: Jim Cason, Rachel Holmes, Devlin Ramsey, and Duncan Gibson. All of the residents used drugs except for Donaldson, and Gibson dealt drugs, as well. Donaldson objected to Gibson's drug dealing at the house, and so, on or about April 1, 2000, he asked Gibson to move out. Gibson had not done so before Donaldson was shot and killed by an armed intruder on April 4, 2000.
Kimberly Carter knew all of the occupants at Donaldson's house. She and Jim Cason were friends, and she had previously sold marijuana to Rachel Holmes. Ms. Carter's mother lived two doors away from Donaldson's house, and Carter was a frequent visitor at Donaldson's home, as well as that of her mother. On a few of these visits, Carter took her boyfriend, Andrew Raymond, to Donaldson's house.
On April 3, 2000, a birthday party was held at Donaldson's house for Kimberly Carter's father. Carter and other members of her family attended the party, as did Andrew Raymond.
The following day, Gibson, Ramsey, and "two Canadians" packed up and sold marijuana to a constant stream of people who came to Donaldson's house, and Carter drove Gibson and the two Canadians to various locations to make deliveries of marijuana to other purchasers.
Late in the evening of April 4, 2000, two armed men entered Donaldson's house through the front door. Rachel Holmes and Jim Cason were eating dinner in the living room while watching television. Duncan Gibson was in his upstairs bedroom with Devlin Ramsey. Kimberly Carter's brother Joe and a woman named Jessica Losey were with Donaldson in his upstairs bedroom. *1170 Holmes and Cason recognized one of the armed intruders, Andrew Raymond, as Kimberly Carter's boyfriend. They did not know the other intruder, whom they later described as a Mexican. He was subsequently identified as Albert Jaquez.
Raymond pointed a black, medium sized handgun at Holmes and Cason. Jaquez was holding an assault rifle. Threatening to shoot, Raymond ordered Holmes and Cason to the floor, and they complied. Gibson, Losey, Ramsey, and Carter's brother Joe overheard the threat to shoot and fled the residence, down the staircase and out the back door. Donaldson remained upstairs.
While Raymond started up the stairs, Jaquez poked Holmes and Cason with his gun and asked if they had any money, jewelry, or drugs. Cason could hear his room being ransacked upstairs, and he heard someone twice yell, "Get down on the floor." He then heard gunshots, and footsteps running down the stairs and out the back door. Jaquez also fled.
Cason and Holmes ran upstairs, where they found Donaldson lying on the floor, curled up on his side. Donaldson subsequently died from gunshot wounds to his trunk and leg.
Shortly after the shooting, Kimberly Carter gave Gibson inaccurate descriptions of the cars driven by the suspects, in order to protect Raymond and Jaquez.
On April 6, 2000, Ms. Carter called Kevin Grover, the father of her two children, and told him that her boyfriend was involved in a murder, that she was wanted for questioning, and that she needed him to come pick up their children. When he arrived, Carter told him that she, Raymond, and Jaquez had gone to Donaldson's house, that she had knocked on the back door, and that she had "chickened out" and gone to her mother's house while the robbery took place. She also told Grover that Raymond called her after the robbery and told her they had gotten away with the money and drugs, that Donaldson was shot when he did not lie down on the floor as ordered, and that "the guy they had actually gone in for" had escaped out the back door.
Carter's Admissions to Police at the April 11 Interview
On April 11, 2000, Everett police questioned Kimberly Carter. She told the detectives that on April 4 she drove Gibson and two Canadians around to do a couple of drug deliveries, in exchange for marijuana. After dropping Gibson off in Marysville, she called a cell phone number that Raymond had given her. A friend of Raymond's answered the phone, and she told this friend that Gibson had a large amount of marijuana and cash. In response, the friend replied, "Damn, do you hear this, [Gibson's] got all this money... let's go jack this nigger."
Kimberly Carter also said that shortly thereafter, Jaquez and some of his friends came to her apartment and told her that they were going to "go rip [Gibson] off for his money and for the pot." Carter said that she did not believe that they were serious, because Jaquez and his friends had joked before about robbing Gibson.
Carter told police that she drove by herself to her mother's apartment in Everett on the night of April 4, and that she and her sister fled the area after hearing screaming coming from Donaldson's house. After parking at a nearby McDonalds restaurant, she walked back toward Donaldson's house to see what had happened. Along the way, she ran into Gibson, who told her that Donaldson had been shot.
Carter's Admissions to Police at the April 13 Interview
On April 13, 2000, during a second interview with the detectives, Kimberly Carter changed her statement, admitting that when she called the cell phone number Raymond had given her, she actually spoke with Raymond, rather than with an unidentified friend as earlier claimed. She further admitted that she told Raymond that Gibson had a large quantity of drugs and cash, and that they had discussed how they could set up the robbery by having her contact Gibson to order some marijuana, thus ensuring that he would be at Donaldson's residence when Raymond arrived to rob him. Although no mention of the use of guns was put into the *1171 interview report, one of the detectives subsequently testified that he remembered Kimberly Carter saying that guns would be used during the robbery.[2]
Carter further acknowledged that, prior to the robbery, she met with Raymond at her Seattle residence and then went to her brother Joe's house to discuss the robbery plans further. At her brother's house, she asked Joe to make the call to Gibson to order some marijuana, which he apparently did. Joe then told her to go to her mother's house, where it would be safer, which she did. Ms. Carter told police that Joe, Raymond, and Jaquez drove to Everett to commit the robbery while Carter drove to her mother's home, where she remained while the robbery took place.
The Witness Tampering
Everett detectives arrested Raymond after Jim Cason and Rachel Holmes identified Carter's boyfriend as one of the robbers. Sometime after the robbery, Holmes moved into Carter's Seattle apartment. Carter asked Holmes to change her story to state that Gibson had actually been Donaldson's shooter, and Holmes did so. She also asked Cason to change his story, be he refused. Some time later, after reading her horoscope, Holmes decided that the best thing to do was to return to her original version of the incident. Accordingly, she met with an Everett detective and wrote a statement summarizing the incident, and describing Raymond as Donaldson's shooter.

PROCEDURAL HISTORY
By amended information dated August 18, 2000, Carter was charged with one count of first-degree felony murder based on the predicate felonies of first degree robbery and first degree burglary. She was also charged with one count of tampering with a witness.
After a CrR 3.5 hearing, the trial court admitted Carter's various statements to witnesses and to the detectives into evidence at the trial.
On September 13, 2000, a jury convicted Kimberly Carter as charged. Ms. Carter's standard range was 310 to 393 months. The court sentenced her to serve 348 months for the felony murder conviction and a concurrent 8 months for the witness tampering conviction. And the court ordered community placement for Carter for "2 years or the period of earned early release, whichever is longer[.]"
This appeal followed. Ms. Carter challenges her felony murder conviction and sentence.

ANALYSIS
The Faulty Accomplice Liability Instruction
In order to be deemed an accomplice, an individual "must have acted with knowledge that he was promoting or facilitating the crime for which the individual was eventually charged," rather than "any and all offenses" that may have been committed by the principal. State v. Cronin, 142 Wash.2d 568, 578-79, 14 P.3d 752 (2000) (emphasis in original); RCW 9A.08.020(3). An accomplice need not have specific knowledge of every element of the crime committed by the principal; rather, the accomplice's "general knowledge of his coparticipant's substantive crime" suffices for accomplice liability. State v. Roberts, 142 Wash.2d 471, 512, 14 P.3d 713 (2000) quoting State v. Rice, 102 Wash.2d 120, 683 P.2d 199.. Here, the substantive crimes were the predicate felonies of robbery and burglary in the first degrees.
The accomplice liability instruction provided to Ms. Carter's jury stated:
A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.
A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of a crime, she either:

*1172 (1) solicits, commands, encourages, or requests another person to commit the crime; or
(2) aids or agrees to aid another person in planning or committing the crime.
The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.
Instruction No. 8; CP 191 (emphasis added).
Substantially similar instructions were found to be defective by our Supreme Court in Roberts, 142 Wash.2d at 510-13, 14 P.3d 713, and Cronin, 142 Wash.2d at 572, 578-79, 14 P.3d 752. The co-defendants in Roberts and Cronin, who were tried separately, were each convicted of both felony murder in the first degree and premeditated murder in the first degree with aggravating factors. During his trial, Cronin's jury heard Cronin's statement to police that although he was present with Roberts during the commission of the predicate felonies of kidnapping and robbery, he was not present with Roberts when the victim was killed, in that he was moving the victim's car into position for purposes of the getaway. Cronin, 142 Wash.2d at 576-77, 14 P.3d 752.
On their respective appeals, both Cronin and Roberts won new trials on the premeditated murder charges, but their felony murder convictions were affirmed. See Roberts, 142 Wash.2d at 478, 534, 14 P.3d 713; Cronin, 142 Wash.2d at 582, 586, 14 P.3d 752. In neither case did the Supreme Court provide an analysis explaining why the erroneous accomplice liability instruction required reversal of the premeditated murder conviction, but did not affect the felony murder conviction.
In State v. Bolar, 118 Wash. App. 490, 78 P.3d 1012 (2003) we provided that analysis. The accomplice liability instruction given at Bolar's trial was similar to the ones given in Cronin, Roberts, and here. Because Bolar was convicted only of felony murder, and not premeditated murder, we concluded that the erroneous accomplice liability instruction was harmless per se. 74 P.3d at 670. The State proved indisputably that Bolar was the actual shooter of the person killed in the course of a first degree burglary committed by Bolar and a confederate. We will not repeat the entire Bolar analysis here, and simply refer the interested reader to that decision. Here, we will explain why the erroneous accomplice instruction remains harmless per se with respect to a felony murder conviction even where the defendant was not the shooter, and indeed, was not even present during the commission of the predicate felony or felonies, but only participated in planning them.
Citing State v. Rice, 102 Wash.2d 120, 125, 683 P.2d 199 (1984), we said in Bolar that when it comes to felony murder standing alone, and where the evidence conclusively shows that all of the participants acted as principals in committing the predicate felony, an accomplice liability instruction is superfluous, for the felony murder statute itself establishes the complicity of both the killer and nonkiller participant in the homicide, as principals. Bolar, 74 P.3d at 669.
Although technically superfluous, an accomplice liability instruction nevertheless provides a convenient means of explaining to the jury the concept of "participant liability" in felony murder trials where more than one participant was personally present during the commission of the predicate felony. And in felony murder trials where, as here, the defendant was not personally present during the commission of the predicate felony, an accomplice liability instruction is probably essential to explaining the concept of "participant liability" to the jury. Thus, we did not intend to imply in Bolar that such an instruction should never be given during felony murder trials where more than one participant acted in the commission of the predicate felony. The superfluity of the accomplice liability instruction in Bolar was pointed out in order to illustrate the harmlessness of the error contained in the instruction, not to discourage the use of proper accomplice liability instructions in cases of felony murder.
*1173 As our Supreme Court explained in State v. Carothers, 84 Wash.2d 256, 264, 525 P.2d 731 (1974), disapproved on other grounds by State v. Harris, 102 Wash.2d 148, 153-54, 685 P.2d 584 (1984):
The Legislature has said that anyone who participates in the commission of a crime is guilty of the crime and should be charged as a principal, regardless of the degree or nature of his participation. Whether he holds the gun, holds the victim, keeps a lookout, stands by ready to help the assailant, or aids in some other way, he is a participant.

See also State v. Toomey, 38 Wash.App. 831, 840, 690 P.2d 1175 (1984) (defendant who planned a robbery with her confederate and helped lure the victim to the scene of the robbery, and then, by prearrangement with her confederate, left the scene before the robbery was committed, participated in the robbery and thus could not escape liability for felony murder when the confederate shot and killed the victim in the course of the robbery).
Here, the State proved that Ms. Carter was a participant in the first degree burglary and first degree robbery by proving beyond a reasonable doubt that she preplanned the commission of these predicate crimes, in conjunction with Raymond and Jaquez, who then carried them out while she waited nearby.
Outside the confines of felony murder, the flaw in the accomplice liability instructions used in Cronin, Roberts, and here, raises the concern that a jury could convict a defendant of the charged crime based on his or her complicity in some other crime than the one charged. In order to convict a defendant of premeditated murder, the State must prove that the defendant either (1) acted with premeditated intent in killing another person, or (2) had general knowledge that she was aiding in the commission of the crime of murder. See Cronin, 142 Wash.2d at 581-82, 14 P.3d 752. Thus, with respect to a charge of premeditated murder, it would not be sufficient to show that the defendant acted with general knowledge that she was aiding a burglary or a robbery, during the course of which a confederate, with premeditation, killed someone. But with respect to a charge of felony murder, which is a strict liability crime for which the only mens rea that need be shown is that necessary to prove the predicate felony, the State need only prove that the defendant acted with general knowledge that she was aiding a burglary or a robbery, during the course of which a confederate killed another person who was not a participant in the predicate crime or crimes. See Roberts, 142 Wash.2d at 511 n. 14, 14 P.3d 713.
In the case of felony murder, there is simply no other crime but the predicate felony that will support the murder charge, no matter how much additional criminal activity the defendant may have engaged in. This was made clear to Ms. Carter's jury by the "to convict" instruction for felony murder.[3]:
This, in a nutshell, is why the erroneous accomplice liability instruction, while reversible error with respect to the premeditated murder convictions in both Cronin and Roberts, *1174 was harmless beyond a reasonable doubt with respect to their felony murder convictions, and why it was harmless beyond a reasonable doubt, here. We affirm Ms. Carter's first degree felony murder conviction.
The remainder of this opinion lacks precedential value and will not be printed in the Washington Appellate Reports, but will be filed of record in accord with RCW 2.06.040.
GROSSE, J., and SCHINDLER, J., concur.
NOTES
[1] We treat the remainder of Ms. Carter's contentions on appeal, which we also find to be without merit, in the unpublished portion of this opinion.
[2] At the trial, Ms. Carter interposed the statutory defense to felony murder, under which a defendant must prove four facts by a preponderance of the evidence, one of which is that she did not know that any other participant in the predicate felony was armed with a deadly weapon. See RCW 9A.32.030(1)(c). By its verdict, the jury clearly rejected the statutory defense.
[3] The "to convict" instruction read:

To convict the defendant of the crime of First Degree Murder as alleged in Count 1 each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) On or about April 4, 2000 David Scott Donaldson was killed.
(2) That the defendant or an accomplice was committing or attempting to commit
(a) Robbery in the first degree
OR
(b) Burglary in the first degree
(3) That the defendant or an accomplice caused the death of David Scott Donaldson in the course of or in furtherance of such crime
(4) That David Scott Donaldson was not a participant in the crime; and
(5) That the acts occurred in [the] State of Washington.
If you find from the evidence that elements (1), (3), (4) and (5) and either (2)(a) or (2)(b) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. Elements (2)(a) and (2)(b) are alternatives and only one need be proved. You must unanimously agree that (2)(a) has been proved, or that (2)(b) has been proved.
On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.
Instruction 7, Clerk's Papers at 190.