# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2017 JAN 17 AM 9: 14

STATE OF WASHINGTON, )
                             )    DIVISION ONE
          Respondent,     )
                             )    No. 76033-5-I
       v.                       )
                             )    UNPUBLISHED OPINION
MARKIS ADAM OVERLY, )
                             )
          Appellant.      )    FILED: January 17, 2017
                             )

DWYER, J. — Markis Overly appeals from the judgment entered on a jury's verdict finding him guilty of one count of harassment of a criminal justice participant, a class C felony. The same jury acquitted him of a charge of threats to bomb or injure property, a class B felony. He asserts that the State failed to present sufficient evidence to support his conviction, that his counsel provided constitutionally ineffective representation by not pursuing a diminished capacity defense, that the trial court improperly denied his two requests to proceed pro se, and that the sentencing court erred by imposing mandatory legal financial obligations without first conducting an inquiry into his ability to pay pursuant to RCW 9.94A.777. There was no error. We affirm.

I

Overly was employed by the Department of Veterans Affairs (VA). Overly's supervisor and coworkers viewed him as a good worker who was generally cordial and pleasant.

Overly went on temporary medical leave in November 2012. Three months later, while visiting the VA for medical treatment, Overly had a negative interaction with two elderly patients.[1] The incident caused Overly to urge the VA police to arrest the patients. However, the responding officer, Detective Ulysses Rambayon, declined to take further action.

A month later, as part of his ongoing medical treatment, Overly began seeing a psychiatrist, Dr. Deborah Hickey, for treatment of his depression and anxiety and to evaluate him for bipolar mood disorder. Overly visited with Dr. Hickey eight times between March and the end of June.

On June 27, Overly met with Dr. Hickey for a scheduled appointment. He seemed "extremely agitated," having just arrived from an encounter with the same elderly couple from the February incident. Overly said that he had not taken his medication for several weeks.

During the session, Overly repeated an earlier request that Dr. Hickey write a letter diagnosing him as suffering from a permanent disability so that he could retire from working at the VA. Dr. Hickey declined, explaining that she had not yet completed his evaluation and treatment. Dr. Hickey further told Overly that, as he was aware, she had already written a letter extending his temporary

_____

[1] Overly believed he had been assaulted.

- 2 -

medical leave for an additional two months. Overly intimated that, if he could not get the letter diagnosing him as permanently disabled, he would "solve it in his own fashion."

Overly began to voice his frustration with the VA and that he felt disrespected by the VA police—specifically for their failure to arrest the elderly patients involved in the February incident. Overly then became "very angry," saying that he was going to go to the VA with a gun and kill 20 people and that, after the shooting, he planned to commit "suicide by police." Overly said that, because he did not currently own a gun, his plan was to wait until he received his paycheck the next day, use that money to purchase a gun, and then go to the VA.

In an attempt to defuse the situation, Dr. Hickey asked Overly how his son would feel about the actions he described. Overly replied that his son "would be proud of him when he grew up and understood what the issues were." Near the end of the appointment, Overly stood up and began shaking his finger in Dr. Hickey's face, telling her that, if she had been "legally raped" by the VA police, she would understand why he did not want to go back to the VA. Despite Dr. Hickey's efforts to convince him to stay, Overly left the therapy session 20 minutes early, saying that he would not be returning.

Throughout the day, Dr. Hickey repeatedly attempted to contact Overly's psychologist, Dr. Coon, who had been treating Overly for more than a year. She was unable to reach him. Dr. Hickey did not contact the VA.

Meanwhile, nearly 20 minutes after he left his therapy session, Overly telephoned the VA police department and spoke with the supervising officer, Lieutenant Freedom Hadnot. During the conversation, Overly heatedly expressed his frustration about the inadequacy of the response by the VA police to the February incident.

One hour later, Overly telephoned Richard Tangen, his supervisor at the VA, with whom he had worked for a year and a half. They spoke for 40 minutes. The tone of Overly's voice was "very agitated" throughout. At the outset of their conversation, Overly stated that "things were coming to an end," that he was not coming back to work, that he was "tired of dealing with everyone," and that the VA police violated his rights by failing to pursue the arrests he requested.

Overly said that he had not taken his medication recently and that, in response to his situation, he planned to "exercise his Second Amendment right" and "strap up." Overly further said that the sign near the entrance to the VA indicating that no weapons were permitted on the campus was a "joke" and that the media would be all over the place after "the incident," wondering why an "exemplary employee did what - - whatever would happen." He said that he was going to target the VA police first and that he was particularly upset with Detective Rambayon. He said that he was going to start with the building in which Detective Rambayon worked and that he was going to blow up a building, not caring if it took out an entire block. Overly repeatedly indicated that he had a plan for how to proceed in his journal and on his computer, but when pressed for more detail, he declined to elaborate.

- 4 -

Tangen urged Overly not to purchase a firearm. Overly replied that he did not presently have a gun but that he could go out and purchase one that day. Tangen asked him to consider about what his kids would think if he followed through on his statements. Overly replied that entries on his computer and in his journal would explain what he was thinking.

Early in the conversation, Tangen became concerned that Overly would actually carry out the threats. Tangen felt this way for several reasons, including that he felt that working at a government installation placed him at a greater risk of harm than the average person, that Overly's angry and upset demeanor on the telephone call strongly clashed with his prior view of Overly as a pleasant and cordial employee, and that he did not know what Overly was capable of doing. Tangen urged a coworker to contact the VA police. The coworker did so.

Officers John Gladson and Scott Sherman, who worked in a building a few minutes away, were dispatched to Tangen's office. The telephone call had been placed on speakerphone in Tangen's office and Officers Gladson and Sherman listened in. Officer Gladson left 10 minutes after arriving to notify his superior about the call and but later spoke with Officer Sherman about that which had transpired while he was out of the room. Officer Sherman listened to the call for between 20 and 30 minutes.

Officer Gladson became concerned that Overly intended to carry out the actions that he described. Officer Gladson had known Overly beforehand and had not heard this level of anger from him before. Officer Sherman, who had never met Overly, also felt concerned that Overly intended to carry out his threats

because of his angry tone and the methodical manner in which he explained his plan and the actions he would take.

Overly was arrested later that day. He was charged with the crimes of harassment of a criminal justice participant, a class C felony, and threats to bomb or injure property, a class B felony.

Prior to trial, Overly's attorneys elected to argue a theory of general denial for both charges and declined to pursue a diminished capacity defense.

On the first day of trial, after the jury was empaneled, Overly requested to proceed pro se. Soon thereafter, he clarified his request as one to have more time with his attorneys before each day of trial. The trial court asked Overly if he was withdrawing his motion to represent himself and he replied, "Correct. I just want contact. If I get that, that's fine."

At trial, the State called Dr. Hickey, who testified to her psychiatric treatment of Overly and the statements that he made during the June 27 therapy session. The State also called Tangen, Lieutenant Hadnot, Officer Gladson, and Officer Sherman, who testified regarding Overly's statements on the telephone.

The jury convicted Overly of harassment of a criminal justice participant and found him not guilty of the charge of threats to bomb or injure property.

Immediately after the jury verdict, and again on the day of his sentencing hearing, Overly requested to proceed pro se at sentencing. The trial court initially denied his motion but, at the sentencing hearing, the court permitted him to proceed pro se. Overly then represented himself at the hearing.

The court sentenced Overly to 12 months of community custody and imposed legal financial obligations of $800.

## II

## A

Overly contends that the State failed to present sufficient evidence to support his conviction. This is so, he asserts, because insufficient evidence was presented to support either the jury's finding that his statements constituted a "true threat" or the jury's finding that his statements placed Officers Sherman and Gladson under a fear that a reasonable justice participant would have experienced under all the circumstances present in this case. We disagree.

## 1

Overly first asserts that the State failed to present a constitutionally sufficient quantum of evidence that his statements constituted a "true threat."

In a criminal prosecution, "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). On an appeal from a criminal conviction, due process further guarantees a defendant the right to challenge the sufficiency of the evidence proffered by the government. Jackson v. Virginia, 443 U.S. 307, 314-16, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). A reviewing court conducting an evidentiary sufficiency inquiry must consider "whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.

"A challenge to the sufficiency of the evidence admits the truth of the State's evidence and all reasonable inferences from that evidence." State v. Boyle, 183 Wn. App. 1, 6-7, 335 P.3d 954 (2014) (citing State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)), review denied, 184 Wn.2d 1002 (2015). "We defer to the trier of fact on issues of credibility or persuasiveness of the evidence." Boyle, 183 Wn. App. at 7 (citing State v. Johnston, 156 Wn.2d 355, 365-66, 127 P.3d 707 (2006)).

In addition to generally applicable sufficiency principles, because of the constitutional implications inherent in our review of a "true threat," we conduct a limited independent review of the facts crucial to the true threat inquiry. State v. Kohonen, 192 Wn. App. 567, 577, 370 P.3d 16 (2016).

> "[T]he First Amendment demands more than application of our usual standard of review for sufficiency of the evidence. [State v. ]Kilburn, 151 Wn.2d [36,] 48-49[, 84 P.3d 1215 (2004)]. Instead, we must independently examine the whole record to ensure that the judgment does not constitute a forbidden intrusion into the field of free expression. Kilburn, 151 Wn.2d at 50. We are required to independently review only crucial facts, that is, those facts so intermingled with the legal question that it is necessary to analyze them in order to pass on the constitutional question. Kilburn, 151 Wn.2d at 50-51. In doing so, we may review evidence in the record not considered by the lower court in deciding the constitutional question. Kilburn, 151 Wn.2d at 51. However, our review does not extend to factual determinations such as witness credibility. State v. Johnston, 156 Wn.2d 355, 365-66, 127 P.3d 707 (2006)."

Kohonen, 192 Wn. App. at 577 (alteration in original) (quoting State v. Locke, 175 Wn. App. 779, 790-91, 307 P.3d 771 (2013)).

To support a conviction for harassment of a criminal justice participant, the State must establish that a threat to commit bodily harm was made. RCW 9A.46.020. Thus, because RCW 9A.46.020 criminalizes pure speech, the State must also prove that the alleged threat was a "true threat." Kohonen, 192 Wn. App. at 575 (citing Kilburn, 151 Wn.2d at 54).[2]

> The test for determining a "true threat" is an objective test that focuses on the speaker." Kilburn, 151 Wn.2d at 54. The question is whether a reasonable person in the speaker's position would foresee that the threat would be interpreted as a serious expression of intention to inflict the harm threatened. State v. Allen, 176 Wn.2d 611, 626, 294 P.3d 679 (2013); accord Kilburn, 151 Wn.2d at 46.

> A true threat is a serious threat, not one said in jest, idle talk, or political argument. Kilburn, 151 Wn.2d at 43 (citing United States v. Howell, 719 F.2d 1258, 1260 (5th Cir.1983)). Stated another way, communications that "bear the wording of threats but which are in fact merely jokes, idle talk, or hyperbole" are not true threats. State v. Schaler, 169 Wn.2d 274, 283, 236 P.3d 858 (2010). The nature of a threat "depends on all the facts and circumstances, and it is not proper to limit the inquiry to a literal translation of the words spoken." State v. C.G., 150 Wn.2d 604, 611, 80 P.3d 594 (2003). Statements may "connote something they do not literally say . . . ." Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 290 F.3d 1058, 1085 (9th Cir. 2002). Consistently with this recognition, our court has held that "[w]hether a statement is a true threat or a joke is determined in light of the entire context" and that a person can indirectly threaten to harm or kill another. Kilburn, 151 Wn.2d at 46, 48. Further, "[t]he speaker of a 'true threat' need not actually intend to carry it out. It is enough that a reasonable speaker would foresee that the threat would

---

[2] The State's burden concerning proof of "true threats" arises from "the danger that the criminal statute will be used to criminalize pure speech and impinge on First Amendment rights. True threats are not protected speech because of the 'fear of harm aroused in the person threatened and the disruption that may occur as a result of that fear.'" Kohonen, 192 Wn. App. at 575 (quoting Kilburn, 151 Wn.2d at 46).

-9-

be considered serious." Schaler, 169 Wn.2d at 283 (citation omitted).

Kohonen, 192 Wn. App. at 576-77 (alterations in original) (quoting Locke, 175 Wn. App. at 790).

Thus, the question presented is whether sufficient evidence supports the conclusion that a reasonable person in Overly's position would have foreseen that his statements would be interpreted as a serious expression of an intent to inflict the harm threatened. A sufficient quantum of such evidence was adduced.

First, many of Overly's statements reflected an explicit expression of an intent to do harm, including that he was going to purchase a firearm and shoot 20 people at the VA and that he was going to blow up a building, not caring if it "took out an entire block."

Other statements by Overly bolstered the seriousness of his threats. Overly implied that he had dedicated a substantial quantity of consideration toward doing harm by emphasizing that he had a plan written down in two separate locations, that his son would be proud of him when he was old enough to understand, and that the media would cover the incident. Further, Overly's statements implied a certain immediacy behind them by indicating to Dr. Hickey that he was not going to return (after quitting his therapy session 20 minutes early), that he was going to pursue "his solution," and that he was going to buy a gun the following day once he received his paycheck, and to Tangen that he was not coming back to work, that "it was coming to an end," that he was "tired of dealing with everyone," and that he could go and buy a gun that day.

In addition, Overly's demeanor during his therapy session and telephone calls supported the seriousness of his expression of an intent to do harm. His tone was described as angry and agitated by Dr. Hickey, Lieutenant Hadnot, Tangen, Officer Gladson, and Officer Sherman. Two individuals who knew Overly beforehand, Tangen and Officer Gladson, had never before heard him speak in such a manner or make such violent suggestions. Indeed, prior to this incident, both Tangen and Gladson thought Overly was a pleasant and cordial coworker. Additionally, by expressing that he had not taken his medication, Overly's statements took on an added undercurrent of danger as to what he was capable of doing.

Furthermore, other statements by Overly, when taken in context, conveyed that he was seriously expressing a desire to cause harm to the VA police. Overly was clearly frustrated by the response of the VA police to the February incident, indicating that he felt "legally raped" by their failure to arrest the elderly couple who he felt had wronged him. This frustration was repeatedly referenced during his therapy session with Dr. Hickey and his telephone calls with Lieutenant Hadnot and Tangen. This frustration was also specific, identifying Detective Rambayon in particular as a miscreant in Overly's view.

In this way, many of Overly's statements implied an intent to commit an act of violence and could reasonably be understood to express an intent to harm the VA police and, as collateral damage, other VA employees. By conveying that he was going "strap up," "exercise his Second Amendment right," "start with the building where Detective Rambayon works," and commit "suicide by police," and

by stating that the no-weapons sign outside of the VA was a "joke," Overly's statements could reasonably be interpreted to express an intent to commit harm to the VA police and other VA employees.

Taken together, Overly's statements explicitly and implicitly conveyed his anger, frustration, and, ultimately, his expression of an intent to cause bodily injury to the VA police. A reasonable person in Overly's position would foresee that these statements would be treated as a serious expression of his intention to commit the harm that he threatened. Thus, sufficient evidence was adduced to support the determination that Overly's statements constituted a "true threat."

2

Overly next contends that the State failed to present sufficient evidence to support the jury's determination that his statements placed Officers Sherman and Gladson under a fear that a reasonable justice participant would have experienced under all the circumstances.

RCW 9A.46.020 sets forth the crime of harassment:

(1) A person is guilty of harassment if:
(a) Without lawful authority, the person knowingly threatens:
(i) To cause bodily injury immediately or in the future to the person threatened or to any other person . . .
. . . and
(b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out.
(2) . . . .
(b) A person who harasses another is guilty of a class C felony if any of the following apply: . . . (iii) the person harasses a criminal justice participant who is performing his or her official duties at the time the threat is made . . . . For the purposes of (b)(iii) . . . the fear from the threat must be a fear that a reasonable criminal justice participant would have under all the circumstances. Threatening words do not constitute harassment if it is apparent to the criminal justice participant that the person does not have the

present and future ability to carry out the threat.

The evidence proffered by the State was sufficient to support the determination that the officers experienced fear of a type that a reasonable criminal justice participant would have had under all of the circumstances present in this case. Overly's statements made during the telephone call to Tangen, in which Officers Gladson and Sherman participated, provided sufficient proof on this question. Officer Gladson, who had known Overly beforehand as a pleasant person, had never heard him speak in such a violent manner. Based on Overly's demeanor, Officer Gladson's experience as a police officer, and what he heard Overly say, he was concerned that Overly would actually carry out the threats.

After listening to Overly speak for half an hour, Officer Sherman—based on Overly's tone and the seriousness with which he discussed his plan to do harm—shared Officer Gladson's concern:

> He seemed like he had -- he was -- he had a plan. He was very
> methodical about it, because he was able to stay calm and not --
> not raise his voice to the point where I wasn't unable to understand
> him or -- it was very clear what he was saying.

Thus, sufficient evidence was adduced that the officers were placed under a fear of a type experienced by a reasonable criminal justice participant that Overly would carry out his threat of violence against them.

The State presented sufficient evidence to support the conviction for harassment of a criminal justice participant.

B

Overly next asserts that he was denied effective assistance of counsel because his attorneys declined to pursue a diminished capacity defense on his behalf. We disagree.

In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both deficient performance and resulting prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Failure to make the necessary showing on either prong of the test defeats the claim. Strickland, 466 U.S. at 697.

Counsel's performance is deficient when it falls below an objective standard of reasonableness. State v. Stenson, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997). Our scrutiny of defense counsel's performance is highly deferential and employs a strong presumption of reasonableness. Strickland, 466 U.S. at 689; State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "To rebut this presumption, the defendant bears the burden of establishing the absence of any 'conceivable legitimate tactic explaining counsel's performance.'" State v. Grier, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011) (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

> Defense counsel must investigate
>
> all reasonable lines of defense, [Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)] especially "the defendant's 'most important defense.'" [Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (quoting Sanders v. Ratelle, 21 F.3d 1446, 1457 (9th Cir. 1994)), amended by 253 F.3d 1150 (9th Cir. 2001)]. . . . Once counsel reasonably selects a defense, however, "it is not deficient performance to fail to pursue alternative defenses." [Rios v. Rocha, 299 F.3d 796, 807 (9th Cir. 2002)].

In re Pers. Restraint of Davis, 152 Wn.2d 647, 721-22, 101 P.3d 1 (2004) (footnotes omitted). It is a legitimate trial tactic for defense counsel, when defending against multiple charges, to focus on acquittal of the more serious of the charges. See, e.g., State v. Silva, 106 Wn. App. 586, 596, 24 P.3d 477 (2001) (counsel admitting, during closing argument, that defendant probably committed crimes of attempting to elude a police vehicle and forgery and focusing on acquittal of second degree assault and felony hit and run); State v. Hermann, 138 Wn. App. 596, 605-06, 158 P.3d 96 (2007) (counsel admitting, during closing argument, that defendant likely committed crime of first degree theft and focusing on acquittal of two counts of first degree trafficking in stolen property).

Overly was charged with two crimes, threats to bomb or injure property, a class B felony, and harassment of a criminal justice participant, a class C felony. Faced with these charges, Overly's attorneys elected a defense of general denial, rather than both general denial and diminished capacity.

Raising a defense of general denial to both charges was a legitimate trial strategy. We can conceive that Overly's attorneys contemplated that they had a strong general denial defense to the threat to bomb charge. The jury's decision to acquit Overly supports this analysis. This was the most serious of the two charges. We can also conceive that the attorneys also believed that their general denial defense was strong as to the harassment charge (the fact that the primary claim on appeal is that insufficient evidence was adduced on that charge supports this inference). We can further conceive that counsel thought it a bad

tactic to defend in the alternative—asserting both general denial and diminished capacity on both charges. We can conceive that defense counsel may have worried that this would weaken their defense on the class B felony count. Finally, we can conceive that defense counsel may have considered it a poor tactic to plead general denial on the class B felony count while pleading diminished capacity on the class C felony count. Based on the jury's acquittal of Overly of the crime of threats to bomb or injure property, the tactics employed by defense counsel were largely successful. Overly has not shown that his attorneys' decision not to pursue a diminished capacity defense was other than a conceivable trial tactic. Thus, he fails to establish a ground for appellate relief.

C

Overly next contends that the trial court, in separate rulings, erroneously deprived him of his right to proceed pro se both at trial and at sentencing. We disagree.

We review the denial of a request to proceed pro se for abuse of discretion. State v. Madsen, 168 Wn.2d 496, 504, 229 P.3d 714 (2010) (citing State v. Hemenway, 122 Wn. App. 787, 792, 95 P.3d 408 (2004)). "Discretion is abused if a decision is manifestly unreasonable or 'rests on facts unsupported in the record or was reached by applying the wrong legal standard.'" Madsen, 168 Wn.2d at 504 (quoting State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

A defendant in a criminal prosecution has a right to the assistance of counsel. U.S. CONST. amend. VI; Wash. CONST. art. I, § 22 (amend.10). This

right to counsel may be waived, but such a waiver must be "knowing, voluntary, and intelligent." City of Bellevue v. Acrey, 103 Wn.2d 203, 208-09, 691 P.2d 957 (1984) (citing Argersinger v. Hamlin, 407 U.S. 25, 92 S. Ct. 2006, 32 L. Ed. 2d 530 (1972)). "If counsel is properly waived, a criminal defendant has a right to self-representation." Acrey, 103 Wn.2d at 209 (citing Wash. CONST. art. I, § 22 (amend.10); U.S. CONST. amend. VI; Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)).

The right to proceed pro se, however, is not absolute. Madsen, 168 Wn.2d at 504 (citing State v. Woods, 143 Wn.2d 561, 586, 23 P.3d 1046 (2001)). "When a defendant requests pro se status, the trial court must determine whether the request is unequivocal and timely." Madsen, 168 Wn.2d at 504 (citing Stenson, 132 Wn.2d at 737). If the request is unequivocal and timely, the court must then determine if the request is voluntary, knowing, and intelligent. Madsen, 168 Wn.2d at 504 (citing Faretta, 422 U.S. at 835; State v. Stegall, 124 Wn.2d 719, 881 P.2d 979 (1994)). Courts are required to "'indulge in every reasonable presumption' against a defendant's waiver of his or her right to counsel." In re Det. of Turay, 139 Wn.2d 379, 396, 986 P.2d 790 (1999) (quoting Brewer v. Williams, 430 U.S. 387, 404, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977)).

"The trial court's discretion lies along a continuum that corresponds with the timeliness of the request to proceed pro se." State v. Breedlove, 79 Wn. App. 101, 107, 900 P.2d 586 (1995). If a request is "made during the trial or hearing, the right to proceed pro se rests largely in the informed discretion of the trial court." State v. Fritz, 21 Wn. App. 354, 361, 585 P.2d 173 (1978)).

We review each motion to proceed pro se independently to determine whether the requirements for pro se status were met. Madsen, 168 Wn.2d at 505.

1

Overly first requested to proceed pro se on the first day of trial, after the jury had been empaneled and jeopardy attached, requesting to represent himself at trial. During his discussion with the trial court, however, Overly clarified that he was actually requesting additional "personal time with my attorneys prior to court every day so we can discuss -- so I know what we're going to do." The trial court granted Overly's request for additional time with his counsel, requiring that one of the two attorneys representing Overly meet with him every day prior to trial. At the end of the discussion, the court inquired: "So you're withdrawing your motion to represent yourself?" to which Overly replied, "Correct. I just want contact. If I get that, that's fine."

Overly affirmatively withdrew his request to proceed pro se at trial. This was obviously not an unequivocal request to proceed pro se. There was no trial court error.

2

Overly renewed his request to proceed pro se shortly after the jury verdict, requesting to represent himself at sentencing. The trial court did not then grant his request. However, when Overly renewed this request at the start of the sentencing hearing, the trial court granted him pro se status. Overly then represented himself at the sentencing hearing.

Because Overly's request to represent himself at sentencing was granted, his contention that the trial court erred by denying his request fails. There was no error.

## D

Overly next contends that the sentencing court erred by assessing the mandatory $100 DNA fee and $200 criminal filing fee against him without first determining whether he had the ability to pay such fees pursuant to RCW 9.94A.777.[3]

After being allowed to proceed pro se, Overly represented himself at his sentencing hearing. He did not request that the sentencing court determine that he suffers from a mental health condition pursuant to RCW 9.94A.777. Because he failed to raise this issue at his sentencing hearing, Overly waived any claim of error in this regard. Pro se litigants are held to the same standards as attorneys. State v. Bebb, 108 Wn.2d 515, 524, 740 P.2d 829 (1987). Overly's decision to proceed pro se does not entitle him to a special dispensation from normal procedural requirements.[4]

---

[3] "Before imposing any legal financial obligations upon a defendant who suffers from a mental health condition, other than restitution or the victim penalty assessment under RCW 7.68.035, a judge must first determine that the defendant, under the terms of this section, has the means to pay such additional sums." RCW 9.94A.777.

[4] Overly submitted a pro se statement of additional grounds in which he advances several arguments. None call for appellate relief. He claims that the trial court improperly deprived him of his right to proceed pro se and that he received ineffective assistance of counsel by his attorneys' failing to bring a diminished capacity defense on his behalf. These claims have been discussed herein. No further discussion is warranted.

Overly next argues that his counsel was ineffective for not sufficiently communicating with him prior to trial. As mentioned herein, Overly raised this issue before the trial court and the trial court granted him additional time with his attorneys prior to each day of trial. Having received the remedy he requested, Overly cannot now assign error to this matter.

Overly next claims that he was denied his Sixth Amendment right to confront witnesses against him. This claim, along with his remaining claims, is largely incoherent, failing to

Affirmed.

We concur:

_Leach, J._          _Dwyer, J._

_Schindler, J._

---

adequately inform this court of the nature and occurrence of the alleged errors. RAP 10.10(c); State v. Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).