[No. 16907-0-II.   Division Two.   August 25, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. RUFUS BREEDLOVE, AKA LAWRENCE LEE BREEDLOVE, *Appellant*.

*Thomas E. Doyle* and *Robert M. Quillian*, for appellant.
*John W. Ladenburg, Prosecuting Attorney*, and *Thomas C. Roberts, Deputy*, for respondent.

WIGGINS, J. — Lawrence Breedlove appeals his conviction for second degree murder, arguing, most significantly, that the conviction should be reversed because the trial court erroneously denied his request to proceed pro se. Because Breedlove's assertion of his right to self-representation was unequivocal, timely, and not interposed for improper purposes, we hold that the trial court erred in denying Breedlove's request to represent himself, and we therefore reverse Breedlove's conviction and order a new trial.

## FACTS

Breedlove was accused of murdering Gregory Atkins by stabbing him to death on or about July 21, 1992. Two eyewitnesses and the dying Atkins identified Breedlove as the murderer.

On July 24, 1992, Breedlove was charged with first degree murder. The trial date was originally set for

September 28, 1992, but was continued to November 30, 1992, upon Breedlove's motion for continuance. On November 25, 1992, the trial date was again continued, this time to December 7, 1992.

Breedlove contends that he first asserted his right to self-representation in October 1992 in a motion wherein he "respectfully request[ed] that he be assigned as pro se co-counsel and allowed to actively participate in his own defense . . . ." In his pro se brief to this court, Breedlove asserts that he submitted his handwritten pro se motion on October 15 or 16, 1992, but that the court failed to address the issues in the motion, stating that it would only consider issues presented by assigned counsel. There is no evidence in the record regarding any court proceedings on either October 15 or 16, 1992. Moreover, although a copy of this motion is included in the clerk's papers, the motion does not have a date stamp indicating that it was filed with the court. Thus, there is no proof in the record that the lower court even received this motion.

At a November 18 hearing, twelve days before the then-scheduled trial, Breedlove filed an additional handwritten pro se motion in which he again asserted his right to proceed pro se. In his motion, after asserting that his defense counsel was not preparing a defense, Breedlove stated, "[w]hen such is the case the accused would be better off going to trial as pro-se counsel for his defense with pro-counsel at hand. The latter is what is herein urged." Breedlove also stated, "the accused strenuously urge[s] the Court to grant his motion dismissing defense counsel and allowing the accused to act as pro-se counsel with pro-counsel . . . ." The motion concluded: "The Petitioner/ Accused . . . do[es] hereby serve notice that he will be proceeding in his own defense in this matter hereinafter before the Court and request[s] the Court allow defense counsel to respectfully withdraw and appoint one as pro-counsel to assist the accused." The trial judge declined to hear any of Breedlove's motions that day, but agreed to hear argument on such motions on November 25.

At the November 25 hearing, Breedlove filed more motions, requesting that his appointed counsel be permitted to withdraw; that he be permitted "to proceed as pro se counsel" and to have "standby-counsel" appointed to assist him in his defense; and that he be granted an extension of time to prepare his own defense. November 25, 1992, the Wednesday before Thanksgiving, was the last court day before the then-scheduled trial of Monday, November 30, 1992. When called upon by the court, Breedlove stated, "I would ask that I be able to handle my own defense." Additionally, Breedlove's defense attorney requested that he be permitted to withdraw, stating that there had been a complete breakdown in the communications between himself and Breedlove; that Breedlove indicated that he did not trust counsel's professional judgment; and that Breedlove refused to cooperate with defense counsel. Defense counsel also noted that Breedlove had filed a number of motions with the court, that he had filed a lawsuit in federal district court and that he was very knowledgeable with the workings of the judicial system.

The trial court denied Breedlove's motion to proceed pro se and ruled that the parties would proceed to trial with present counsel. By order filed November 25, 1992, the court formally granted a one-week continuance to December 7, 1992, and denied Breedlove's motions (1) for a longer continuance, (2) to dismiss defense counsel, and (3) to proceed pro se, with or without standby counsel.

The jury trial commenced on December 9, 1992. During trial, Breedlove renewed his motion to proceed pro se. The trial judge declined to reconsider the motion. Ultimately, the jury convicted Breedlove of murder in the second degree.

## Analysis

### Pro Se Representation

The Washington State Constitution expressly guarantees one's right to self-representation: "In criminal

prosecutions the accused shall have the right to appear and defend in person, or by counsel . . . ." Wash. Const. art. I, § 22 (amend. 10).[1]

In *State v. Fritz*,[2] the Court of Appeals delineated the following principles relevant to a defendant's request to proceed pro se: A criminal defendant has an independent constitutional right to represent himself or herself without the assistance of legal counsel. The exercise of this right must be requested by the defendant, and the court is not initially required to advise a defendant of the existence of the right. The request or demand to defend pro se must be knowingly and intelligently made, it must be unequivocal and it must be timely, i.e., it may not be used to delay one's trial or obstruct justice. The right of self-representation cannot be permitted to justify a defendant's disrupting a hearing or trial, or as a license to a pro se defendant not to comply with rules of procedural and substantive law. Finally, standby counsel may be appointed, even over the objection of the defendant, to assist the accused if and when he or she requests help, and to represent the accused in the event that the defendant's self-representation is terminated.

■■ We review a lower court's disposition of a request to proceed pro se for abuse of discretion. In our review, we are mindful of the guidelines for ruling on motions to proceed pro se enunciated by the *Fritz* court:

> The cases which have considered the timeliness of a proper demand for self-representation have generally held: (a) if made well before the trial . . . and unaccompanied by a motion for continuance, the right of self-representation exists as a matter of law; (b) if made as the trial . . . is about to commence, or shortly before, the existence of the right depends on the facts of the particular case with a measure of discretion reposing in the trial court in the matter; and (c) if made

---

[1]This right is also grounded in the federal constitution. In 1975, the United States Supreme Court, in *Faretta v. California*, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) declared that a defendant has a federal constitutional right to self-representation.

[2]21 Wn. App. 354, 358-64, 585 P.2d 173 (1978), *review denied*, 92 Wn.2d 1002 (1979).

during the trial . . . the right to proceed pro se rests largely in the informed discretion of the trial court.[3]

The trial court's discretion lies along a continuum that corresponds with the timeliness of the request to proceed pro se. Breedlove's motion to proceed pro se falls in the second category of cases discussed by *Fritz* because it was made shortly before the trial was to commence and because it was accompanied by a motion for continuance.

We interpret *Fritz* and other Washington cases to mean that if the request is made shortly before the trial, at the beginning of trial or midtrial, the trial court must exercise its discretion by balancing the important interests implicated by the decision: the defendant's interest in self-representation and society's interest in the orderly administration of justice.[4] Because these meaningful interests may be in direct competition, their value has an inverse relationship during the course of the proceedings: before trial the defendant's interest in self-representation is paramount but as the trial gets closer and once it begins, the interest in the orderly administration of justice becomes weightier.[5]

■ Washington case law indicates only two types of cir-

---

[3]*Fritz*, 21 Wn. App. at 361.

[4]Washington courts employ a balancing analysis without explicitly recognizing the competing nature of the interests implicated by the decision. *See State v. Garcia*, 92 Wn.2d 647, 655-56, 600 P.2d 1010 (1979); *State v. Chase*, 59 Wn. App. 501, 506, 799 P.2d 272 (1990); *State v. Kender*, 21 Wn. App. 622, 624, 587 P.2d 551 (1978), *review denied*, 91 Wn.2d 1017 (1979). With respect to midtrial motions *see, e.g., State v. Jordan*, 39 Wn. App. 530, 541, 694 P.2d 47 (1985), *cert. denied*, 479 U.S. 1039 (1987); *Fritz*, 21 Wn. App. at 363 (quoting *People v. Windham*, 19 Cal. 3d 121, 560 P.2d 1187, 1191-92, 137 Cal. Rptr. 8, *cert. denied*, 434 U.S. 848 (1977)).

[5]Other courts have expressly recognized this inverse relationship. *See, e.g., United States ex rel. Maldonado v. Denno*, 348 F.2d 12, 15 (2d Cir. 1965), *cert. denied sub nom. DiBlasi v. McMann*, 384 U.S. 1007 (1966) (defendant has unqualified right to represent self prior to start of trial but once trial has begun defendant must show that the prejudice to legitimate interests of defendant overbalances potential disruption of proceedings already in progress); *Windham*, 560 P.2d at 1191-92 (whether a midtrial request to proceed pro se should be granted is within the sound discretion of the trial court, who should consider the possible prejudice to the defendant and the disruption or delay that could follow from granting the motion).

cumstances that warrant the denial of a motion to proceed pro se that is made shortly before trial or as the trial is about to begin. The trial court can deny the request if it finds either (1) that the motion is made for improper purposes, i.e., for the purpose of unjustifiably delaying a trial or hearing,[6] or (2) that granting the request would obstruct the orderly administration of justice.[7]

We hold that the same analysis governs a pretrial motion to proceed pro se when it is accompanied by a motion for continuance. We therefore review the lower court's denial of Breedlove's motion to determine whether it can be based on a finding that Breedlove interposed his request for improper reasons or that to grant the motion would obstruct the orderly administration of justice.

We conclude that Breedlove made an unequivocal, timely motion to proceed pro se and, although Breedlove simultaneously requested a continuance, there is no evidence in the record that the motion was interposed for the purpose of delay or harassment. Nor does the record reflect that granting the motion would likely have impaired the efficient judicial administration in the present case. As the trial court neither engaged in a colloquy with Breedlove regarding the pro se motion nor stated on the record the reasons for its denial of Breedlove's motion, we find no basis to conclude otherwise.

Although Breedlove at first did not clearly and unequivocally ask to proceed pro se, by November 25 he had refined his petition into an unequivocal request that the court allow him to "proceed as pro se counsel and [that the court] appoint standby-counsel assistance . . . ." Also, during the

---

[6]See *Fritz*, 21 Wn. App. 354; *Kender*, 21 Wn. App. 622; *see also Chapman v. United States*, 553 F.2d 886 (5th Cir. 1977) and *United States v. Price*, 474 F.2d 1223, 1227 (9th Cir. 1973) (holding assertion of right to self-representation is timely if asserted before the jury is empaneled, at least where there is no suggestion or affirmative showing that the motion is a tactic to secure delay).

[7]*See, e.g., Garcia*, 92 Wn.2d at 656; *Price*, 474 F.2d at 1227; *see also Windham*, 560 P.2d at 1191 n.5 (holding that "[w]hen the lateness of the request and even the necessity of a continuance can be reasonably justified the request should be granted.").

hearing on November 25, 1992, Breedlove stated to the court, "I would ask that I be able to handle my own defense." These latter requests are clear and unequivocal assertions of Breedlove's right to self-representation.

■ The timing of Breedlove's motion is not a sufficient reason alone to deny his request for self-representation. First, although Breedlove's most clear and succinct demand to proceed pro se was made the last court day before the trial was to begin, he expressed his dissatisfaction with his attorney and moved the court to allow him to act as pro se counsel ("with pro-counsel at hand") on November 18, 1992; almost two weeks before the then-scheduled trial and three weeks before the actual trial. It was the trial court that deferred the hearing on the motion to proceed pro se until November 25, 1992, the day before trial. Where a court is put on notice that the defendant wishes to assert his right to self-representation but it nevertheless delays ruling on the motion, the timeliness of the request must be measured from the date of the initial request.

Second, there is no evidence in the record that Breedlove's request to proceed pro se, despite its timing or the fact that it was accompanied by a motion for continuance, was designed to delay his trial. We reject the State's contention that an improper purpose may be inferred from the mere fact that the motions were made simultaneously. Such an inference is inappropriate because Breedlove did not condition his request to proceed pro se with a demand for a continuance and because the motion for continuance may, just as well, evince his expressed desire to prepare the defense his counsel had allegedly neglected to prepare.

Third, the record fails to justify denying Breedlove's motion to proceed pro se out of a concern for the orderly administration of justice.

Finally, Washington courts have recognized that the timeliness requirement should not operate as a bar to a defendant's right to defend pro se:

[The] imposition of a 'reasonable time' requirement should

not be and, indeed, must not be used as a means of limiting the defendant's *constitutional* right to self representation. We intend only that a defendant should not be allowed to misuse the *Faretta* mandate as a means to unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice. . . . When the lateness of the request and even the necessity of a continuance can be reasonably justified the request should be granted.[8]

Because there is no evidence that Breedlove's motion was designed to delay his trial or that granting it would have impaired the orderly administration of justice, we hold that the trial court abused its discretion in denying Breedlove's request.

■ The erroneous denial of a defendant's motion to proceed pro se requires reversal without any showing of prejudice.[9] We cannot meaningfully hold that the denial of the right of self-representation is harmless error; most defendants are probably better represented by counsel than themselves. Denial of this constitutional right is prejudicial in itself, regardless of the consequences of self-representation.[10]

The Sixth Amendment right to self-representation confers upon the defendant a very important entitlement, which is designed to respect individual autonomy.[11] As one court has noted

Even if the defendant [is] likely to lose the case anyway, he has the right—as he suffers whatever consequences there may be—to the knowledge that it was the claim that he put forward that was considered and rejected, and to the knowledge that in our free society, devoted to the ideal of individ-

---

[8]*Fritz*, 21 Wn. App. at 362 (quoting *Windham*, 560 P.2d at 1191 n.5).

[9]*State v. Estabrook*, 68 Wn. App. 309, 317, 842 P.2d 1001 (citing *Savage v. Estelle*, 924 F.2d 1459, 1466 (9th Cir. 1990), *cert. denied*, 501 U.S. 1255 (1991)), *review denied*, 121 Wn.2d. 1024 (1993).

[10]*See Chapman*, 553 F.2d at 891-92 (cited with approval in *Fritz*, 21 Wn. App. at 360-61).

[11]*State v. DeWeese*, 117 Wn.2d 369, 375, 816 P.2d 1 (1991).

ual worth, he was not deprived of his free will to make his own choice, in his hour of trial, to handle his own case.[12]

Because the unjustified denial of this right requires reversal, we reverse Breedlove's conviction and order a new trial. Breedlove may reassert his right to self-representation or may accept assistance of counsel. If Breedlove chooses to defend pro se, the court will ascertain whether his waiver of counsel is voluntarily, knowingly and intelligently made.[13] A colloquy on the record is the appropriate method to make such a determination.[14]

Our reversal of Breedlove's conviction disposes of the appeal. Nevertheless, we address some of the remaining issues to the extent that they may arise on remand.[15]

### Jurisdiction

Breedlove asserts that the Pierce County Superior Court lacked subject matter and personal jurisdiction because he was arrested in King County. These challenges are meritless. Subject matter jurisdiction is provided by article IV, section 6, of the Washington State Constitution, which states "[t]he superior court shall have original jurisdiction . . . in all criminal cases amounting to felony . . . ." Wash. Const. art IV, § 6; *see also* RCW 2.08.010. Additionally, RCW 9A.04.030 indicates that the State has personal jurisdiction over persons who commit any crime in the state.

### Sufficiency of the Information

We reject Breedlove's claim that his conviction for

---

[12]*United States v. Dougherty*, 473 F.2d 1113, 1128 (D.C. Cir. 1972).

[13]*DeWeese*, 117 Wn.2d at 377; *State v. Bebb*, 108 Wn.2d 515, 525, 740 P.2d 829 (1987).

[14]See *Bellevue v. Acrey*, 103 Wn.2d 203, 209, 691 P.2d 957 (1984) and *State v. Chavis*, 31 Wn. App. 784, 644 P.2d 1202 (1982), for good descriptions of this inquiry.

[15]Breedlove contends that the officer lacked authority to arrest him; that he was denied his constitutional right to enter the plea of his choice; that the trial court was prejudiced against him; and that he was a victim of selective and vindictive prosecution. We decline to consider these claims because they lack merit or are unsupported by citation to authority or legal argument. *See State v. Monson*, 113 Wn.2d 833, 847, 784 P.2d 485 (1989).

second degree murder violated his constitutional rights because the information charged only first degree murder. RCW 10.61.003 specifically allows the conviction of a defendant on a lesser degree.

### Suppression of Statement

The trial court correctly refused to suppress Breedlove's statement to Detective Werner, which was not preceded by *Miranda*[16] warnings. Werner arrested Breedlove in Seattle and personally transported him to Tacoma. At trial, Werner testified that, as the patrol car entered Tacoma, Breedlove asked what city they were in and that Werner told Breedlove "he was in Tacoma where he had killed somebody . . . ." According to Werner, Breedlove responded that he had never been in Tacoma. On cross-examination, Werner also testified that he did not expect a response from Breedlove to his statement regarding their whereabouts.

One is entitled to the protections afforded by *Miranda v. Arizona*[17] if he or she is "(1) taken into custody or otherwise deprived of his freedom of action in a significant way and (2) subjected to custodial interrogation."[18] The trial court correctly refused to suppress Breedlove's statement because *Miranda* warnings were not required here and the exclusionary rule was inapplicable. Werner did not interrogate Breedlove because Werner's statement was not "reasonably likely to elicit an incriminating response" from the suspect.[19]

The exchange between Werner and Breedlove closely

[16]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3d 974 (1966).

[17]384 U.S. 436.

[18]*State v. McWatters*, 63 Wn. App. 911, 915, 822 P.2d 787, *review denied*, 119 Wn.2d 1012 (1992).

[19]*Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); *see also State v. Bradley*, 105 Wn.2d 898, 903-04, 719 P.2d 546 (1986) (adopting the *Innis* definition of interrogation).

resembles that in *State v. Webb*.[20] In *Webb*, the defendant, while being booked, asked the officer "if all this is necessary." The officer replied, "You're damn right this is necessary. You went in and vandalized Sheryl's apartment."[21] The defendant then stated, "But the stuff I damaged was mine too."[22] The Court of Appeals held that the officer's statement "not only was a reasonable response to [the defendant's] inquiry, but it did not call for a response from [the defendant]."[23] The court concluded that the officer "could not have known that his . . . statement would elicit an incriminating response from [the defendant]" and therefore the defendant's statement was not induced by improper custodial interrogation.[24] In the instant case, Werner, just as the officer in *Webb*, responded to Breedlove's question with an accusation that Breedlove committed the crime for which he was arrested. As in *Webb*, Werner's statement did not call for a response from Breedlove and Werner could not have known that his statement would elicit an incriminating response from Breedlove. As such, Werner's statement was not interrogation and the absence of *Miranda* warnings is irrelevant.

## Right To Remain Unshackled

Breedlove also argues that he was denied his constitutional right to a fair and impartial hearing because the trial court denied his motion to remain unshackled during his jury trial. We review the trial court's decision to shackle a defendant under an abuse of discretion standard[25] and affirm its ruling.

A criminal defendant has a constitutional right to ap-

---

[20] 64 Wn. App. 480, 824 P.2d 1257, *review denied*, 119 Wn.2d 1015 (1992).

[21] *Webb*, 64 Wn. App. at 486.

[22] *Webb*, 64 Wn. App. at 486.

[23] *Webb*, 64 Wn. App. at 486.

[24] *Webb*, 64 Wn. App. at 486.

[25] *Spain v. Rushen*, 883 F.2d 712, 716 (9th Cir. 1989), *cert. denied*, 495 U.S. 910 (1990); *State v. Hartzog*, 96 Wn.2d 383, 401, 635 P.2d 694 (1981).

pear before a jury, free of shackles, unless some impelling necessity demands restraint of the prisoner.[26] The trial judge has broad discretion to provide for order and security in the courtroom and to shackle the defendant if such measures are necessary.[27]

In *State v. Hartzog*,[28] our Supreme Court adopted several factors that a trial court may consider, inter alia, in determining whether physical restraint of the defendant is warranted:

> [T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

The trial court did not abuse its discretion when it ordered that Breedlove's wrist shackles be removed but that the leg shackles remain because there were legitimate reasons to believe that shackling Breedlove's ankles was a necessary precaution. First, Breedlove had previously escaped from an Oklahoma prison and thus could be considered an escape risk. Second, Breedlove's criminal history (convictions for first degree murder and armed robbery) and the nature of the present charge indicated he had a propensity for violence. Finally, Lt. Maassen, who was responsible for ensuring the timely presence and physical control of Breedlove, stated (1) that he believed Breedlove, who is six feet, three inches tall and 200 plus pounds, posed a threat to courtroom security and to the officers assigned to escort him and (2) that "[a]lthough I

---

[26]*Jones v. Meyer*, 899 F.2d 883, 884 (9th Cir.), *cert. denied*, 498 U.S. 832 (1990); *State v. Williams*, 18 Wash. 47, 51, 50 P. 580 (1897).

[27]*Jones*, 899 F.2d at 884; *Hartzog*, 96 Wn.2d at 400-01.

[28]96 Wn.2d at 400-01 (quoting *State v. Hartzog*, 26 Wn. App. 576, 588-89, 615 P.2d 480 (1980)).

would prefer to have Mr. Breedlove remain in wrist restraints and ankle restraints, I believe physical control can be maintained without wrist restraints (while in court)." Thus, there were compelling circumstances warranting restraint of Breedlove during the trial.

Additionally, it appears that the trial judge appropriately considered and attempted to minimize the effects of using physical restraints on Breedlove. By allowing the removal of Breedlove's wrist shackles the court considered the effect visible shackles may have on the presumption of innocence as well as on Breedlove's ability to take notes and to confer with his defense counsel. We conclude that the trial court properly exercised its discretion in ruling that Breedlove's ankle shackles would remain. The trial court can reevaluate this decision on remand, since "[t]he necessity for [additional security] measures must be made on a case-by-case basis after a hearing with a record evidencing the reasons for the action taken."[29] The fact that Breedlove may be representing himself before the lower court will interject a new element in the analysis of the appropriate security measures.

## Calculation of Offender Score

The final issue raised by Breedlove is the appropriate classification, for offender score purposes, of an out-of-state crime committed before Washington's enactment of its Sentence Reform Act (SRA) in 1981 and before Washington's reclassification of felonies in 1975.[30] This precise issue is a matter of first impression in the state of Washington.

The SRA created a grid of standard sentencing ranges which vary depending on the defendant's offender score and the seriousness of the crime. The offender score measures a defendant's criminal history and is calculated

---

[29]*Hartzog*, 26 Wn. App. at 588-89.

[30]*See* Laws of 1975, 1st Ex. Sess., ch. 260 (codified at RCW 9A.20.020)

by totaling the defendant's convictions for felonies and certain juvenile offenses.[31]

■ The Court of Appeals held in *State v. Johnson*[32] that pre-1975 crimes committed in Washington should be reclassified under their current classification. Reclassification is "consistent with the purpose of the SRA to avoid diverse treatment" of defendants.[33]

RCW 9.94A.360(3) provides for classification of out-of-state crimes under Washington law:

> Out-of-state convictions for offenses shall be classified according to the comparable offense definitions and sentences provided by Washington law.

We conclude that a pre-1975 out-of-state conviction, just like a pre-1975 Washington conviction, should be reclassified according to current felony classifications when computing an offender score.

This conclusion is supported by case law and policy. *Johnson* clearly states that, for the purposes of calculating a defendant's offender score, pre-1975 crimes are to be reclassified under Washington's then current felony classifications.[34] The fact that the pre-1975 crime was committed in another jurisdiction should not affect the classification of the crime for offender score purposes.[35] Additionally, *State v. Weiand*, which dealt with the classification of a post-SRA out-of-state crime, recommended the conclusion we arrive at today:

> We note in passing, however, that if pre-1975 Washington convictions are to be classified according to Washington ele-

---

[31]*State v. Wiley*, 124 Wn.2d 679, 682, 880 P.2d 983 (1994).

[32]51 Wn. App. 836, 759 P.2d 459, *review denied*, 111 Wn.2d 1008 (1988).

[33]*Johnson*, 51 Wn. App. at 839; *see also State v. Garrison*, 46 Wn. App. 52, 728 P.2d 1102 (1986) (stating that one of the purposes of the SRA is to establish a uniform system of punishment for adult offenders).

[34]51 Wn. App. 836.

[35]*See Wiley*, 124 Wn.2d at 682.

ments enacted in 1975, the same might be true for pre-1975 out-of-state convictions.[36]

Finally, our ruling comports with the stated purpose of the SRA to treat defendants uniformly by making sentences "commensurate with the punishment imposed on others committing similar offenses."[37] Clearly, if Breedlove had committed the crime at issue in Washington in 1971, the *Johnson* rule would apply and the crime would be reclassified under the classifications set forth in 1975. It would contravene the purpose of the SRA to give Breedlove a lesser sentence merely because in 1971 he committed the crime in another jurisdiction.

Reversed and remanded for a new trial.

SEINFELD, C.J., and FLEISHER, J., concur.

---

[36]*State v. Weiand*, 66 Wn. App. 29, 34 n.10, 831 P.2d 749 (1992).

[37]RCW 9.94A.010(3).