# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52661-1-II |
| Respondent, | |
| v. | |
| RANDOLPH THOMAS GRAHAM, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, C.J. — Randolph T. Graham appeals his convictions for murder in the first degree, attempted murder in the first degree, drive-by shooting, manufacture of marijuana, and possession of a controlled substance. Graham argues that the trial court erred by (1) providing the jury with a first aggressor instruction and (2) denying his request to represent himself. Graham also submits a statement of additional grounds (SAG) raising numerous issues.

Because Graham raises the first aggressor issue for the first time on appeal and fails to argue or show that any error was a manifest error of constitutional magnitude, we decline to review Graham's first aggressor instruction claim. As to Graham's self-representation claim, we hold that the trial court did not err by denying Graham's request to represent himself. We also hold that the arguments in Graham's SAG lack merit or will not be addressed because they are raised for the first time on appeal. Accordingly, we affirm Graham's convictions.

No. 52661-1-II

FACTS

Randolph Graham and the Lesters were neighbors. Due to arguments over a shared well, an easement, and Graham's pet rabbits, Graham and the Lesters were not on good terms. On May 23, 2018, Graham drove up to the Lesters' house while Randy Lester and his son, Hunter, were playing basketball. Graham shot Randy[1] multiple times, and Randy died.

On August 21, 2018, the State charged Graham by Third Amended Information of murder in the first degree, attempted murder in the first degree, drive-by shooting, manufacture of marijuana, and possession of a controlled substance. The State alleged multiple aggravating factors relating to the murder in the first degree charge: being armed with a firearm, conduct during the offense manifesting deliberate cruelty to the victim, the victim being particularly vulnerable or incapable of resistance, the offense involving a destructive and foreseeable impact on persons other than the victim, and a demonstrated or displayed egregious lack of remorse. The State also alleged that the attempted murder in the first degree charge was aggravated by Graham being armed with a firearm.

A. JURY TRIAL

1. Jury Selection

During jury voir dire, the trial court asked the prospective jurors if they had knowledge of the case. Specifically, the court inquired into whether prospective jurors had information that was not in the public domain. Juror "Yellow No. 30" responded that she received information from Daniel Rogers, a name on the witness list. Verified Report of Proceedings (VRP) (Aug. 21, 2018)

---

[1] Because several of the witnesses have the same last names, the victim and some witnesses are referred to by their first name. No disrespect is intended.

2

(individual voir dire) at 43. Yellow No. 30 stated that Rogers had been her horseshoer for several years. Rogers had stopped by Yellow No. 30's house the past weekend and started talking about the case. Randy, the victim, was Rogers's son-in-law. According to Yellow No. 30, "[Rogers] talked about how he was—what his daughter was going through. I think he was mostly upset about during the investigation he had mentioned that his son-in-law's body was left out and that upset him." VRP (Aug. 21, 2018) (individual voir dire) at 44. During her conversation with Rogers, Yellow No. 30 told Rogers that she was on jury duty, so they should not talk about the case. Rogers and Yellow No. 30 stopped their conversation quickly. In response to questioning from Graham's counsel, Yellow No. 30 stated that she did not know any facts about the case other than there was someone killed and she did not know how the person was killed. Yellow No. 30 also stated that her conversation and relationship with Rogers would not prevent her from being fair and impartial. Yellow No. 30 was selected to be on the jury.

After the trial court had empaneled the jury, the trial court asked the parties if the jury included the members they had selected. Both parties responded, "Yes." VRP (Aug. 21, 2018) (voir dire supplemental) at 129.

2.     Request to Self-Represent

At the start of the third day of trial, Graham informed the court that he was firing his attorney and that he wanted to represent himself. Specifically, Graham stated:

> Some things have changed in my life. After yesterday, what went on here in the courtroom, the things that I've heard, I'm going to fire my attorney right here, right now, and I'm going to ask you to allow me some leniency because of how I've been incarcerated and represent myself because I'm under a—what do you call—a self-defense is what I'm claiming. I'm not guilty.

3

I'd like to be able to present my case on my side on my behalf under what I know is quasi pro se, and I'm just asking you for that opportunity to do that. That ways [sic] I can actually defend myself, because what I got yesterday was no defense. I had two questions and a couple other things that I wasn't real happy with and I'm really not happy about, especially after spending the evening down there praying about it.

And I think the only way I'm going to get any kind of representation so I don't have to look at a jury with tears in their eyes, to watch my mom bawl because of how it's defamating [sic] who I am, and it's not who I am, and the things that are being brought up by the state is absolutely out of line. That's all I can say.

There's no reason why they need to be pulling this over here. They need to stick to who was at that scene. Nobody was at that scene. There was a man and a boy, one deceased, and that boy and me. And some things have been said that are so far out of line, it ain't even funny.

So I'm just asking you that I can at least have some subpoenas done. Even if you have to dismiss this and we reconvene later, that's fine with me. All right.

But my daughter needs to be here and bring all that paperwork that I had in a case, because I'm not going to allow Mrs. Lester to call me crazy ever again, not when I got pictures. I had a whole case set up to sue these people, and I believe that if the court will allow me to do this, I think that you'll be absolutely shocked at what I have, and I can actually prove that.

But I'm not going to hear about being crazy and dead people and all that stuff, not when I know for a fact that a Fortune 500 company is incinerating ancient remains, and that is so out of line for her to call my [sic] crazy for that.

VRP 3 (Aug. 23, 2018) 330-32.

Defense counsel informed the court that he was prepared to proceed with the trial, had discussed defense strategy with Graham, his trial strategy has been in line with the theory of self-defense, and he had a "very positive relationship" with Graham. VRP 3 (Aug. 23, 2018) at 332. In response, Graham claimed that he had twenty minutes with counsel in ninety days and stated "I need some subpoenas." VRP 3 (Aug. 23, 2018) at 333.

4

The trial court conducted a colloquy with Graham. In response to the court's inquiry as to whether he had ever represented himself before, Graham stated that he had not, but he had spoken to some friends who had self-represented in the past. In response to the court's further inquiries, Graham also stated that he did not yet have any legal training; he had taken some paralegal classes about 20 years ago; and he was not familiar with the rules of evidence, so he "would much prefer" reconvening at another time so that he would have additional time because he tried "to pull some of that stuff up, but I can't find it" at the "kiosk." VRP 3 (Aug. 23, 2018) at 335.

At the time Graham made his request to self-represent, the State had already called 9 witnesses to testify and was in the middle of questioning its tenth witness. That tenth witness was Rachel Lester, the dead victim's wife.

The trial court denied Graham's request to self-represent. The court expressed concern about Graham's ability to understand the legal process, particularly with the admissibility of evidence. Additionally, the trial court stated that the State's evidence had been presented in a manner consistent with the law and the court rules, and that Graham's counsel knew what he was doing and was conducting the defense strategically given the nature of the charges at issue. The court also took into consideration the gravity and the seriousness of the charges against Graham. As to Graham's request for time to become familiar with the rules of evidence, the court declined allowing Graham additional time to learn the law and the court rules, stating:

> I'm not willing to stop the trial, I'm not willing to declare a mistrial to give you the opportunity to do so.

VRP 3 (Aug. 23, 2018) at 337.

3.    Lay Witness Testimony

Bernard Guy Graham, Graham's father, testified that Graham visited him at his house on May 23, 2018. Graham had about 20 rabbits. Graham told Bernard that his neighbor had killed his rabbits that day. Graham had had issues with this neighbor in the past. Graham had complained that the neighbor had blocked Graham's "right of way" to Graham's house by parking a car on one side of the "right of way" and placing a basketball net on the other side. VRP 2 (Aug. 22, 2018) at 223-24. There was also an issue with the shared well. The neighbor had placed a "Do Not Trespass" sign on the well and was not paying the whole bill. VRP 2 (Aug. 22, 2018) at 224. On the day of the incident, Graham called Bernard, said that he had shot his neighbor, and asked Bernard to come to his house.

Hunter Lester, Randy's son, testified that on May 23, 2018, Hunter headed outside his house, saw Graham drive by, and waved to Graham. After Hunter waved, Graham sped up towards his own house. Hunter had never seen him do this before. After Graham pulled up to his own house, Hunter heard a gunshot, which Hunter believed came from Graham.

Hunter also testified that he and Randy started playing basketball. While they were playing basketball, Randy did not have a firearm on him. After five to ten minutes, Graham pulled up in his black truck. Hunter and Randy stepped off onto the side of the road. Graham stuck his hand out the window, said "Hey, Randy," and started shooting. VRP 2 (Aug. 22, 2018) at 273. Randy fell backwards onto the ground. Hunter ran to the back of the house, went inside, and called 911. That is when his mom, Rachel, heard that Randy had been shot.

Rachel Lester, Randy's wife, testified that on May 23, 2018, she was lying in bed and watching television in the evening. She heard a single gunshot. She thought Randy had shot a

6

rabbit.  Then she heard a volley of shots and Hunter screaming.  She saw Hunter calling 911 and heard him say the neighbor shot his dad and killed him.  When she went out the front door, she saw Graham's truck and Randy lying on the ground.  Rachel looked out the window and saw Graham back his truck up to his house, grab white plastic bags out of his truck, and walk back to his house.  Rachel wanted to go to Randy, "but I couldn't.  I was scared, and I didn't want to see him dead."  VRP 3 (Aug. 23, 2018) at 352.  At that point, the police arrived.

Kent Lawrence testified that he lived around the corner from the Lesters.  On May 23, 2018, Lawrence and his wife were working in their yard when Lawrence saw Graham's black truck drive by.  Graham was driving 30 miles per hour; Lawrence had never seen Graham drive so fast.  Then Lawrence heard two gunshots.  They sounded like they came from Graham's house.  After three to five minutes, Lawrence heard another six gunshots.  From the sound, Lawrence could tell the gunshots were coming from in front of the Lesters' house.  During the shooting, Lawrence saw Hunter run around the house, jump onto the porch and run into the house.  After Hunter went into the house, Lawrence heard two more shots.  Lawrence then heard a woman scream.  Lawrence saw Randy lying face down, dead, at the end of his driveway in front of the Lesters' garage.  Lawrence did not see the shooting occur.  Lawrence also did not see any weapons or firearms around Randy.

Nancy Lawrence, who is married to Kent Lawrence, testified that Graham is a neighbor.  Nancy also testified that she heard "between five and six, maybe seven" shots.  VRP 2 (Aug. 22, 2018) at 165.  The sound of the shots was coming from near the Lesters' house.  The shots were fairly fast, but "they weren't exactly one right after another."  VRP 2 (Aug. 22, 2018) at 166.  She

7

saw a black truck parked on the driveway in front of Lesters' house. She thought it was Graham's truck. Nancy also saw Randy lying on the driveway face down.

Graham testified that he lived on Meier Road in May. On May 23, 2018, he had left his house to go to the bank and a home improvement store. Graham came home for a little while and then planned to leave to go to his parents' home to take them lunch and shoot a pistol with his father. He went to his truck and grabbed his pistol. He wanted to make sure it shot, so he shot a round in his front yard. He got back into his truck and placed the gun on the front passenger seat.

Graham also testified that he saw Hunter and Randy come out from around the corner and start to play basketball. Graham thought he should talk to Randy about the well. Then Hunter and Randy started walking toward his car. Graham noticed a silhouette of a pistol in Randy's left pocket. Graham got "freaked out" and placed his pistol on the console. VRP 5 (Aug. 28, 2018) at 813. Graham saw Randy's hand on the pistol as he approached the truck. Then Randy jumped in front of Graham's truck, causing Graham to brake and get thrown into the windshield. Randy put his cigarette out on Graham's truck and then pointed his pistol at Graham with both arms extended. Graham thought Randy was going to shoot him. In response, "I freak out and just, poof, I shot him. I didn't aim at him, nothing. I just center-massed." VRP 5 (Aug. 28, 2018) at 816. Graham shot Randy to keep Randy from killing him. Graham shot at Randy three times from the truck through the window. Randy started running away from Graham. Graham got out of his truck and started chasing him. Then Randy tripped, but looked like he was turning towards Graham while he was on the ground. Graham thought Randy was going to shoot him, so Graham shot him, once. Graham waited for a minute to make sure Randy was not moving.

Graham further testified that he got back in his truck and backed his truck back up to his own house. He watched Randy's body. He saw Rachel run out of the house and holler. She leaned over the body, and when she came up, Graham saw that she was holding something. Rachel went back into her house. She had picked up the gun.

4. Law Enforcement/First Responder Testimony

Joel Rubin, a patrol deputy for the Lewis County Sheriff's Office, testified that he responded to a call at Meier Road on May 23, 2018. Officer Rubin pulled up in front of the Lesters' residence and saw a person lying on the driveway. Officer Rubin went to the person lying face down on the ground and noticed blood on his back and the back of his head. Later, someone turned Randy over on his back, face up. There were shell casings near the body. Officer Rubin did not see any firearms on the ground or around the body.

Sam Schouten, deputy for the Lewis County Sheriff's Office, testified that he saw a white male individual lying face down in the gravel. There was a bullet hole in the middle of his spine and one to the right of the spine. There also appeared to be "some sort of traumatic injury to the right side base of the male's skull." VRP 3 (Aug. 23, 2018) at 398. Randy had no pulse and was not breathing.

Gabriel Frase, a detective with the Lewis County Sheriff's Office, testified that he was made the primary detective on this case. Detective Frase went to the scene on May 23, 2018. He saw 9-millimeter shell casings around Randy's body and inside Graham's black truck. Detective Frase also testified as to photographs of the scene, including one that showed spent 9-millimeter shell casings. Some bullets hit the Lesters' house. Another photograph was "a photograph that [Frase] took facing straight down showing what the knees of the deceased's pants looked like."

9

VRP 4 (Aug. 24, 2018) at 588. Randy had markings on his knees to show that his knees were on the ground.

Chad Withrow, a police officer with the City of Centralia and a member of the Lewis County Regional SWAT (special weapons and tactics) team, testified that he was activated in his SWAT capacity on May 23, 2018. Officer Withrow was part of the entry team into Graham's residence. Graham was lying in his bedroom on his side and was not very responsive. Officer Withrow observed a Smith & Wesson 9-millimeter pistol partially under Graham's leg.

5.      Forensic Testimony

Emmanuel Lacsina, a forensic pathologist, testified that he performed an autopsy on Randy's body on May 25, 2018. X-rays revealed three bullets in the body. There was a gunshot wound in the back of the upper part of the neck. This was a fatal shot. Randy had a bullet wound 14 inches from the top of head. This wound was superficial. The gunshot wound in the left back perforated the diaphragm and struck the heart in several places. This was also a fatal shot. Another gunshot wound was located 15 1/2 inches below the top of the head. This shot was superficial.

Lacsina also testified that the first bullet that struck Randy was probably the bullet in the chest, which was superficial. He believed that the last injury was the one to the back of the head: "It was the most serious injury, it was the most fatal injury, and death would have been almost instantaneous." VRP 3 (Aug. 23, 2018) at 527. Lacsina further testified that Randy was alive for all of the gunshot wounds.

Johan Schoeman, a forensic scientist with the Washington State Patrol Crime Laboratory, testified that he is a firearms and tool marks examiner. He received a Smith & Wesson model M&P 9, 9-millimeter, Luger semi-automatic pistol from the Sheriff's Office. The handgun

functioned as it was manufactured. He fired the gun three times. He compared the cartridge cases from the test fire to those casings found at the scene. He found that the shell casings from the crime scene were fired from the firearm he tested. Schoeman also determined that the five fired bullets he received were fired from the same firearm. He had no reason to believe that the bullets or casings were fired from a different handgun.

## B.    JURY INSTRUCTIONS

During the discussion on jury instructions with the trial court, the State stated that it would be proposing the primary aggressor instruction. In response, defense counsel stated, "And I can't object to that, given the state's evidence." VRP 5 (Aug. 28, 2018) at 843. Additionally, when the State added the primary aggressor instruction to the instruction packet given to the court, defense counsel stated on the record, "And I'm not objecting to that. I believe the [S]tate's entitled to that based upon their view of the facts." VRP 5 (Aug. 28, 2018) at 864-65. Defense counsel stated that he was not arguing self-defense as to the attempted murder charge.

The trial court's first aggressor jury instruction stated,

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

Clerk's Papers at 116.

## C.    VERDICT AND SENTENCING

The jury found Graham guilty of murder in the first degree while armed with a firearm. The jury also found that Graham's conduct manifested deliberate cruelty to the victim, Graham knew that the victim was particularly vulnerable or incapable of resistance, Graham demonstrated

11

or displayed an egregious lack of remorse, and the crime involved a destructive and foreseeable impact on persons other than the victim. The jury further found Graham guilty of attempted murder in the first degree while armed with a firearm, drive-by shooting, manufacture of marijuana, and possession of a controlled substance.

The trial court sentenced Graham to 800 months in confinement. Graham appeals.

## ANALYSIS

A.    FIRST AGGRESSOR INSTRUCTION

Graham argues that the trial court erred by giving the first aggressor instruction to the jury. Graham contends that "[e]ither [he] committed the homicide by shooting Mr. Lester without provocation, so it was not a precipitating act, or Mr. Lester drew his firearm first making Mr. Graham's use of his weapon lawful self-defense. The first aggressor instruction was not supported by any additional precipitating act." Br. of App. at 16.

Generally, a defendant cannot challenge a jury instruction on appeal if he did not object to the instruction in the trial court. *State v. Salas*, 127 Wn.2d 173, 181-82, 897 P.2d 1246 (1995). RAP 2.5(a) states, "The appellate court may refuse to review any claim of error which was not raised in the trial court."

But under RAP 2.5(a)(3), an appellant may raise an error for the first time on appeal if the error is "manifest" and truly of constitutional dimension. *State v. WWJ Corp.*, 138 Wn.2d 595, 602, 980 P.2d 1257 (1999); *State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988). The defendant must identify a constitutional error and show how the alleged error actually affected the defendant's rights at trial. *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). It is

this showing of actual prejudice that makes the error "manifest," allowing appellate review. *Id.*; *Scott*, 110 Wn.2d at 688.

Jury instructions errors that have been held to be manifest constitutional errors involve errors "'directing a verdict, shifting the burden of proof to the defendant, failing to define thebeyond a reasonable doubt standard, failing to require a unanimous verdict, and omitting an element of the crime charged.'" *State v. Grott*, 195 Wn.2d 256, 268, 458 P.3d 750 (2020) (internal quotation marks omitted) (quoting *State v. O'Hara*, 167 Wn.2d 91, 100-01, 217 P.3d 756 (2009)). "Because first aggressor instructions do not actually relieve the State of its burden of proof, erroneously given first aggressor instructions are not necessarily errors of constitutional magnitude." *Id* at 268-69.

Here, Graham neither argues nor shows that the instructional error was a manifest error of constitutional magnitude. He fails to even cite to RAP 2.5(a)(3) in his opening brief. Therefore, we do not address Graham's challenge. *See State v. Cox*, 109 Wn. App. 937, 943, 38 P.3d 371 (2002) (when an appellant fails to provide argument or authority, this court is not "required to construct an argument on behalf of appellants").

B.    REQUEST TO SELF-REPRESENT

Graham argues that the trial court erred by depriving him of his right to represent himself. Graham contends that his request was unequivocal and that "[g]iven the seriousness of the charges [he] was facing, along with the reality he would serve the rest of his life in prison if convicted, the trial court should have granted [his] motion, despite timeliness issues." Br. of App. at 22.

Criminal defendants have an explicit right to self-representation under the Washington Constitution and an implicit right under the Sixth Amendment to the United States Constitution.

*State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010). "This right is so fundamental that it is afforded despite its potentially detrimental impact on both the defendant and the administration of justice." *Id.* (citing *Faretta v. California*, 422 U.S. 806, 834, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)). "However, both the United States Supreme Court and [our Supreme Court] have held that courts are required to indulge in every reasonable presumption against a defendant's waiver of his or her right to counsel." *Id.* at 504 (internal quotation marks omitted) (quoting *In re Det. of Turay*, 139 Wn.2d 379, 396, 986 P.2d 790 (1999), *cert. denied*, 531 U.S. 1125 (2001)).

We review denials of requests to self-represent for an abuse of discretion. *State v. Hemenway*, 122 Wn. App. 787, 792, 95 P.3d 408 (2004). A trial court abuses its discretion if its decision is manifestly unreasonable or "rests on facts unsupported in the record or was reached by applying the wrong legal standard." *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).

The right to self-represent is neither absolute nor self-executing. *Madsen*, 168 Wn.2d at 504. When a defendant requests to self-represent, the trial court must determine whether the request is unequivocal and timely. *Id.* Absent a finding that the request was equivocal or untimely, the court must then determine if the defendant's request is voluntary, knowing, and intelligent, usually by colloquy. *Id.*

We determine timeliness on a continuum:

"If the demand for self-representation is made (1) well before the trial or hearing and unaccompanied by a motion for a continuance, the right of self representation exists as a matter of law; (2) as the trial or hearing is about to commence, or shortly before, the existence of the right depends on the facts of the particular case with a measure of discretion reposing in the trial court in the matter; and (3) during the trial or hearing, the right to proceed [by self-representation] rests largely in the informed discretion of the trial court."

14

*Id.* at 508 (emphasis omitted) (quoting State *v. Barker*, 75 Wn. App. 236, 241, 881 P.2d 1051 (1994)). "[I]f the request is made shortly before the trial, at the beginning of trial or mid-trial, the trial court must exercise its discretion by balancing the important interests implicated by the decision: the defendant's interest in self-representation and society's interest in the orderly administration of justice." *State v. Breedlove*, 79 Wn. App. 101, 107, 900 P.2d 586 (1995). "[B]efore trial the defendant's interest in self-representation is paramount but as the trial gets closer and once it begins, the interest in the orderly administration of justice becomes weightier." *Id.*

Here, Graham argues and the State concedes that he unequivocally requested to proceed by self-representation. Graham stated on the record that he was firing his attorney and that wanted to represent himself. We agree that Graham's self-representation request was unequivocal.

As to the timeliness of the request, Graham made the request at the beginning of the third day of trial. Nine witnesses had already testified and the State was in the middle of questioning its tenth witness, the victim's wife. The trial court's colloquy with Graham showed that Graham was dissatisfied with the witnesses' testimony and the amount of time his counsel had spent speaking with him, did not have any experience in self-representation, needed subpoenas, and needed a delay to be able to learn the rules of evidence. In ruling on the request, the trial court stated that it was not willing to delay the trial or declare a mistrial to give Graham the time to prepare to defend himself.

Because Graham made his request mid-trial, the trial court did not abuse its discretion in determining that the orderly administration of justice outweighed Graham's interest in self-representation. Thus, Graham's request was untimely, and the trial court did not abuse its decision in denying Graham's request.

15

STATEMENT OF ADDITIONAL GROUNDS

A.    JURY BIAS

Graham argues that he did not receive a fair trial because Juror Yellow No. 30 knew and had talked about the case to Daniel Rogers, the father of Rachel. Graham argues that "[t]he actions of Mr. [Rogers] I believe should be look at as a form of collusion." SAG at 1.

An accused holds a constitutional right to unbiased jurors. *State v. Winborne*, 4 Wn. App. 2d 147, 160, 420 P.3d 707 (2018). The seating of a juror with percipient knowledge of facts comprising the criminal charges compromises this right. *Id*. Due process means a jury capable and willing to decide the case solely on the evidence before it. *Id.* at 169 (citing *Smith v. Phillips*, 455 U.S. 209, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982)).

Decisions of whether a juror is impartial or whether a mistrial is required are matters of discretion for the trial court that will not be overturned on appeal absent abuse of that discretion. *State v. Colbert*, 17 Wn. App. 658, 664-65, 564 P.2d 1182, *review denied*, 89 Wn.2d 1010 (1977). The trial court has discretion in conducting jury voir dire to achieve every reasonable protection for a defendant. *State v. Herman*, 93 Wn.2d 590, 593, 611 P.2d 748 (1980). The defendant's right to a fair and impartial jury is the sole limit on the trial court's exercise of discretion. *State v. Frederiksen*, 40 Wn. App. 749, 752, 700 P.2d 369, *review denied*, 104 Wn.2d 1013 (1985).

"Due process requires the trial judge, if he or she becomes aware of a possible source of bias, to determine the circumstances, the impact thereof on the juror, and whether or not the accused suffers prejudice." *Winborne*, 4 Wn. App. 2d at 160-61. Where there is some prior knowledge about the case, "[t]he relevant question is not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they could not judge

16

impartially the guilt of the defendant." *State v. Jackson*, 150 Wn.2d 251, 269, 76 P.3d 217 (2003) (some alterations in original) (quoting *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984)).

We will not consider issues raised for the first time on appeal unless the claimed error is a manifest error affecting a constitutional right. RAP 2.5(a)(3). *State v. Walsh*, 143 Wn.2d 1, 7, 17 P.3d 591 (2001). The defendant must identify a constitutional error and show how the alleged error actually affected the defendant's rights at trial. *McFarland*, 127 Wn.2d at 333. It is this showing of actual prejudice that makes the error "manifest," allowing appellate review. *Id.*; *Scott*, 110 Wn.2d at 688.

Here, the record shows that Graham never objected to Juror Yellow No. 30 during jury selection. Graham could have made a for-cause challenge or exercised a peremptory challenge to prevent the trial court from empaneling Yellow No. 30, but he did neither. And, after the court announced the empaneled jury and asked the parties if the panel was the jury they had selected, Graham answered in the affirmative.

Graham argues that Juror Yellow No. 30 was biased. An accused holds a constitutional right to unbiased jurors. *Winborne*, 4 Wn. App. 2d at 160. Thus, Graham has identified a constitutional error. However, Graham fails to show actual prejudice.

Juror Yellow No. 30 stated that although she and Rogers had talked about the case, she quickly ended the conversation because she was on jury duty. In response to questioning from Graham's counsel, Yellow No. 30 stated that she did not know any facts about the case other than there was someone killed and she did not know how the person was killed. Additionally, she stated that her conversation and relationship with Rogers would not prevent her from being fair and

17

impartial.  Thus, there is no evidence that Yellow No. 30 was biased and that Graham was deprived of his constitutional right to unbiased jurors.

Because Graham cannot show actual prejudice that makes any error manifest, he has failed to show a manifest constitutional error.  Therefore, we do not address Graham's challenge.

B.     MEDIA MANIPULATION

Graham argues that "there was 'media manipulation' with way too many false accusations given to [the] public."  SAG at 1.

RAP 10.10(c) states, "Reference to the record and citation to authorities are not necessary or required, but the appellate court will not consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors."

Here, Graham merely states that there was "media manipulation" and that there were "false accusations given to [the] public."  SAG at 1.  Beyond these broad allegations, Graham provides nothing further to inform the court of the nature or occurrence of the alleged errors.  Therefore, we decline to review this issue.

C.     DEFENSE FORENSIC PROFESSIONALS

Graham argues that he was not permitted to have his own forensic professionals.  But here, the record shows that Graham never requested having his own forensic professionals or that the trial court denied any such request.  Thus, there is no error for this court to review.  RAP 2.5(a)

No. 52661-1-II

D.     NEW COUNSEL

Graham argues that he was denied new counsel.[2]  But here, the record shows that Graham

never requested new counsel or that the trial court denied any such request.  Therefore, there is no

error for this court to review.  RAP 2.5(a).

E.     WITHHOLDING OF EVIDENCE

Graham alleges that his defense counsel withheld evidence.  But Graham simply states that

his defense counsel withheld evidence.  SAG at 1.  Beyond this broad allegation, Graham provides

nothing further to inform the court of the nature or occurrence of the alleged error.  RAP 10.10(c).

Therefore, we do not review this issue.

F.     PICTURE OF VICTIM

Graham argues that "prosecution shows picture of knees which is not consistent with pants.

He was wearing short pants."  SAG at 1.  Graham did not object to the admission of this exhibit at

trial.  Without more, Graham fails to inform the court of the nature or occurrence of the alleged

error.  RAP 10.10(c).  Therefore, we do not review this issue.

CONCLUSION

Because Graham raises the first aggressor issue for the first time on appeal and fails to

argue or show that any error was a manifest error of constitutional magnitude, we decline to review

Graham's first aggressor instruction claim.  As to Graham's self-representation claim, we hold that

the trial court did not err by denying Graham's request to represent himself.  We also hold that the

---

[2]  Graham also argues that he was denied the opportunity to proceed pro se to question the deputies.
Because this challenge relating to self-representation has been addressed in Graham's direct appeal
above, we do not address it again.  RAP 10.10(a).

19

No. 52661-1-II

arguments in Graham's SAG lack merit or should not be addressed because they are raised for the first time on appeal. Accordingly, we affirm Graham's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, C.J.

We concur:

Maxa, J.

Siddoway, J.P.T.[3]

---

[3] Judge Siddoway is a Division III judge serving with the Court of Appeals, Division II, under CAR 21(a).